### 7274

### FRANKS v. SOUTHERN COTTON OIL CO.

NUISANCE—NEGLIGENCE—CHILDREN.—The evidence in this case tends to show the defendant oil mill negligently and wantonly maintained on its premises at a public place a large reservoir filled with water, that it knew it was unprotected, that it knew children of tender years resorted there as a place of amusement, and that these facts had been called to its attention with requests that the reservoir be properly protected.

Before MEMMINGER, J., Laurens, Fall term, 1908. Reversed.

Action by R. J. Franks, administrator of Luther Franks, against Southern Cotton Oil Company and R. H. Hudgens. From judgment on verdict for defendant, under direction of Court, plaintiff appeals.

*Messrs. Simpson, Cooper & Babb* for appellant. No citations.

*Messrs. Grier & Park* and *Dial & Todd,* contra. *Messrs. Dial & Todd* cite: *Reasons assigned by Judge in directing verdict are immaterial:* 58 S. C., 70; 54 S. C., 340; 55 S. S. C., 1; 52 S. C., 36.

*Messrs. Grier & Park* cite: *Doctrine of time table cases:* 17 Wall., 657; 38 L. Ed. (U. S.), 435. *No grounds for apprehension:* 58 S. C., 268. *Deceased was of sufficient intelligence and discretion to apprehend the dangers:* 76 S. C., 539; 56 Am. St. R., 106. *There should be proof of how the accident happened:* 31 N. E., 220; 2 L. R. A. (N. S.), 905; 72 Pac. R., 1038; 5 Am. & Eng. Ann. Cas., 167; 6 Thomp. on Neg., par. 7395.

August 12, 1909. The opinion of the Court was delivered by

MR. JUSTICE GARY. This is the second appeal herein; the former appeal was from an order overruling a demurrer to the complaint, and is reported in 78 S. C., 10, 58 S. E., 960, 12 L. R. A. (N. S.), 468.

The action is for damages, and the allegations of the complaint, material to the questions under consideration, are as follows:

"That on the 20th day of April, 1906, and prior thereto, the defendant, the Southern Cotton Oil Company, owned and jointly with its manager, R. H. Hudgens, maintained and used in connection with its oil mill at Laurens, South Carolina, a large and deep reservoir, which it kept filled with water to be used in connection with its said oil mill, the said reservoir being located in an open field, near the public highways, streets and many of the residences of the city of Laurens, where children of tender years were accustomed to resort for play, the said reservoir being not

protected by a fence, guard or otherwise, but was exposed and easily accessible to children, who not knowing of the danger made use of it as a place of amusement.

"That it was the duty of the defendant, the Southern Cotton Oil Company, and also the defendant R. H. Hudgens, as manager of the said oil mill, to have securely protected the said reservoir, so that children resorting to it as a place of amusement would not be injured, but the said defendants, not regarding their duty in that behalf, carelessly, negligently, wilfully and wantonly permitted the said reservoir to remain uninclosed or unprotected in any way.

"That the defendant, the Southern Cotton Oil Company, as well as the defendant, R. H. Hudgens, knew of the unprotected condition of the said reservoir, and that children resorted there as a place of amusement, which facts, this plaintiff is informed and believes and so alleges, had been more than once called to the attention of the defendants, with the request that said reservoir be properly protected.

"That the plaintiff's intestate, Luther Franks, a small boy of tender years, being less than ten years of age, while playing around the said reservoir on the 20th of April, 1906, fell into the said reservoir, which was filled with water, and was drowned."

At the close of the plaintiff's testimony his Honor, the presiding Judge, granted a motion for a nonsuit, on the ground that there was no testimony tending to sustain the material allegations of the complaint, whereupon the plaintiff appealed.

The main question in the case, and which will be considered first, is, whether there was any testimony tending to show that the defendants had notice of the facts alleged in the complaint, or knowledge of such facts, as were sufficient to put them on inquiry, which if pursued with due diligence would have led to knowledge of the facts.

R. J. Franks, father of the deceased, testified as follows: "Q. Did you live where you could see the reservoir? A. Yes, sir.   Q. How often if you ever did see any one, how often did you see children around it?   A. A good many times—I couldn't tell—a great many.   Q. Just give your best recollection as to how often during a week? A. Well, sir, there was scarcely a day but what I saw children play around the reservoir.   Q. What size children? A. Nearly all sizes.   Q. Could that reservoir be seen from the building of the oil company?   A. Yes, sir.   Q. Do you know where Mr. R. H. Hudgens works—where his place of business is?   A. Yes, sir, I know where his place of business is.   Q. Where?   A. His office at the oil mill. Q. How long has he been the manager of the oil mill? A. He has been there the biggest part of the time since I have been here at Laurens.   Q. Where have you seen him around the premises there—at different places, or not? A. Oh, yes, sir.   Q. Is he sometimes on the outside looking around over the premises?   A. Yes, sir.   Q. Was there any path or way leading from the street to the reservoir? A. Yes, sir, there was a path leading up that the people generally went to look at the reservoir, went right from the street.   Q. On the banks of the reservoir, what is the character of the soil or embankment?   A. A little piece out from the edge of the reservoir it is cement, and then the balance is level.   Q. What is the width of that level place on the bank?   A. I suppose four or fire feet, maybe six, some places.   Q. Does that extend all the way around it?   A. Yes, sir.   Q. At what place was the tricycle (Luther Frank's) when you got there?   A. Right on the near side of the street, right where I went up.   Q. You state that you found this tricycle, Luther Frank's, nearest the street—the road?   A. Yes, sir, on the bank of the reservoir.   Q. That bank is about how wide?   A. I suppose it is something like an average of five feet, where it is level.   Q. He had been in the habit of going up to that

reservoir, had he not? A. Yes, sir. Q. You knew he was going there? A. Yes, sir. Q. Didn't you warn him against the danger of going up there? A. Of course I did, and chastised him for going. Q. And told him it was dangerous to go around there? A. Yes, sir. Q. You told him he might fall in there and get drowned? A. Yes, sir. Q. You cautioned the little fellow about the danger of fooling around that reservoir? A. Yes, sir. Q. And in spite of that he would continue to slip off and go up there? A. Yes, sir. Q. Did you pay particular attention whether you could see a person from the office to the reservoir? A. Yes, sir. Q. Can you see them? A. Yes, sir. Q. Can you stand in the office of the company and see the reservoir at all? A. Yes, sir. Q. Could you see any one on the other side of the reservoir? A. No, sir. Q. You could only see this part of it? A. See all around the top of it."

W. L. Riddle testified: "Q. Did you ever go to the reservoir while you were a policeman? A. Yes, sir. Q. For what purpose? A. In passing by or passing through, any time that I would see any small chaps loafing or playing around it, I went there and made them get away. Q. How often did you do that? A. Several times. I couldn't say exactly how often—every now and then when I would be passing and see or hear any round there. Q. What size children did you see playing around there? A. They would be anywhere from four or five or six years old, on up to ten or twelve, maybe fourteen—just little boys. Q. How often would you say you have seen them there? A. Oh, I expect I have went there and asked them to go away from there, and not play around there, probably a dozen or more times. Q. How long ago was that? A. In fact, off and on ever since I have been living here. Q. Have you ever noticed from the office of the oil mill, whether this reservoir can be seen or not? A. The front side of the reservoir, you couldn't see from the oil mill at all. Q. How about seeing the top of the reservoir? A. Yes, sir, you

could see the top of it. Q. Where would these children play—on the side or up around the top? A. They would be generally up around the top. It is elevated, you know, and there is a kind of walk-way on top three or four, or four or five feet wide, and that is where they would go to play, and go around and throw rocks in and play around there."

Dr. J. T. Poole testified: "Q. Did your practice carry you in the neighborhood of this reservoir occasionally? A. Very often. Q. Did you ever observe small children playing around that reservoir? A. Several times."

J. W. Snoddy testified: "Q. Prior to the time Luther Franks was drowned, had you seen children play around this reservoir? A. Yes, sir. Q. How often? A. For a good long time I lived right across the street, from the reservoir, and I used to ask them to leave there every day nearly—catch little children around there. Q. What size children were they? A. Anywhere from five or six years to grown men. I have gone in swimming there myself several times. Q. Can you see this reservoir from the oil mill? A. Yes, sir. Q. From the office of the oil mill? A. Yes, sir, you can see it. Q. What difficulty is there in walking up there? A. No trouble. Q. Where did these boys run their tricycles there—around the top? A. On the top, yes, sir."

S. T. Taylor testified: "Q. While you were working there did you ever see any children around the reservoir? A. I have. Q. How many times? A. I couldn't say. Q. What size children did you see there? A. All sizes. Q. At different times? A. Yes, sir. Q. Did you ever receive any instructions from Mr. Hudgens, or any one else connected with the oil mill, with reference to children going there? A. No one but Mr. Hudgens. Q. He is manager of the oil mill? A. Yes, sir. Q. What instructions did he give you? A. I was night watchman there some four or five years. He used to tell me if I seen any one playing

around the reservoir to go up. there and keep them away from there, if possible, and I did so.   Q. He gave you that instructions more than once?   A. Yes, sir, he told me that several times.   Q. At night you would go up there for that purpose?   A. When I would hear them there I would go up there.   A heap of times I would go up there and find them when I had not heard them.   Q. When you heard them bathing around there you would go up there and call them off?   A. Yes, sir."

Albert Hughes, who was examined as a witness on a former trial, testified: "Q. Do you know the location of the reservoir of the cotton oil company over there, where it is?   A. Yes, sir.   Q. Did you ever go there at the instance of any of the oil mill people?   A. Yes, sir, Mr. Park got me to go up there, to run the boys off.   Q. Who was Mr. Park?   A. He was the cashier, I think, over there. Mr. Grier: We make the same objection we did then, that the declaration of Mr. Park, he being a mere bookkeeper, could not bind this company.   The Court: Let it go in on the same principle, that is for the jury.   Mr. Cooper: Q. Did he do that?   A. Yes, sir.   Q. How many times?   A. Very often.   Mr. Cooper: Q. He very often told you to go there and do what?   A. Get the children away from there."

E. R. Blakeley testified: "Q. Had you ever seen any children playing around it?   A. Yes, sir, many a time. Q. Before this boy was drowned?   A. Yes, sir.   Q. In the day time?   A. Yes, sir, and night, too.   Q. How long have you known that situation up there—how long have you known the conditions up there?   A. I don't know exactly, several years—ever since it has been a public place around there."

The tendency of this testimony was to show that the defendants had notice of the facts alleged in the complaint, and that his Honor, the presiding Judge, erred in ruling otherwise.

We do not deem it necessary to reproduce further testimony to show that it tended to prove the other allegations of the complaint.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed, and that the case be remanded for a new trial.