13202

BANNISTER v. F. W. POE MANUFACTURING CO.

(160 S. E., 138)

*Messrs. Haynsworth & Haynsworth,* for appellant, 

*Mr. J. Robert Martin,* for respondent, 

September 11, 1931.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

*Per curiam.*

Upon reading and considering the petition for a rehearing in this case, the Court is satisfied that a correct conclusion was reached as expressed in the opinion here before filed in this case, but for the purpose of clarifying some of the matters referred to, it is ordered that the opinion here before filed be and the same is hereby withdrawn and the opinion hereto attached substituted therefor as the opinion of the Court in the case. It is further ordered that the remittitur be stayed for a period of ten days from the filing of this order.

Mr. Chief Justice Blease and Messrs. Justices Cothran, Stabler, Carter and Bonham concur.

Mr. Justice Carter: This action, commenced in the Court of Common Pleas for Greenville County, June 6, 1930, by T. J. Bannister, as administrator of the estate of T. J. Bannister, deceased, against F. W. Poe Manufacturing Company, is for the recovery of damages in the sum of $20,000.00 on account of the death of the said T. J. Bannister, Jr., who was drowned while swimming or playing in a pond on the defendant's premises, June 19, 1929. For the purpose of a clear understanding of the issues between the parties litigant at the trial in the lower Court, we quote herewith the pleadings in the cause.

The allegations of the complaint are as follows:

"(1) That the defendant, F. W. Poe Manufacturing Company, is a corporation chartered and existing under and by the laws of the State of South Carolina, with officers, agents and place of business in Greenville County, said State, and at the times hereinafter mentioned, and now is, the owner and operator of a large manufacturing plant, engaged in the manufacture and sale of cotton goods, and maintains for the use and benefits of its employees and their families a play ground and a cattle pasture.

"(2) That on the 2nd day of June, 1930, T. J. Bannister was duly appointed by the Probate Judge in and for Green-

ville County Administrator of the estate of T. J. Bannister, Jr., deceased, and institutes this suit under what is commonly known as Lord Campbell's Act for the benefit of the parents of deceased.

"(3) That the defendant as aforesaid maintains a common play ground for the use and benefit of its employees and families adjoining the National Highway leading from Greenville, South Carolina, to Asheville, North Carolina, and immediately adjoining said play ground on the west and a few yards removed therefrom, just over the track of the Southern Railroad, maintains and operates an ordinary cow pasture in which there exists and has existed for a number of years a large artificially created pond of water to which the children of the neighborhood have resorted with the knowledge of the defendant, its agents and servants, and there went in swimming and played upon logs and slabs allowed to float upon said pond, the only protections being a common three-strand pasture wire fence which furnished no hindrance, protection or warning to children who, with knowledge and acquiescence of defendant constantly visited and used the pool as aforesaid.

"(4) That on or about the 19th day of June, 1929, T. J. Bannister, Jr., a small boy of tender years, in the company with other children visited and entered said pool, five to ten feet deep, owned and maintained as aforesaid by the defendant, and while there in swimming and playing in water was drowned.

"(5) The death of plaintiff's deceased resulted from and was caused by the negligent and reckless acts of the defendant, its agents and servants, in maintaining a dangerous pool in close proximity to its manufacturing plant and its play ground without proper guards and warning to the plaintiff's deceased and other small children; in maintaining upon its premises a dangerous instrumentality attractive to children without exercising adequate precautions of safe-guard against their indiscretion and immature judgment of protect-

ing themselves; in maintaining said hole and pool of water in an exposed place which defendant knew that small children came in contact with and in observation of without exercise of care to safe-guard such children from the dangers incident to playing therein, and failing to abate an attractive nuisance, alluring to immature youths of the community and plaintiff's deceased.

"Whereby by reason of each and all of the aforesaid delicts and failures of duty, plaintiff's deceased was drowned and plaintiff damaged in the sum of Twenty Thousand ($20,000.00) Dollars."

The defendant filed the following answer in the cause:

"1. Admits that it is a corporation and that for the benefit of its employees and families, it maintains a playground.

"2. It admits that it has a cow pasture in which its employees, under certain conditions, are permitted to pasture their cows and that in said pasture there is a small pond of water from which the cows drink, but it alleges that said pasture is under a substantial wire fence and has no connection whatever with the playground.

"3. It denies that its employees, or any other persons, are permitted to resort to the pasture or to the pond therein for pleasure, or for any other purpose except that of pasturing their cows.

"4. It admits that T. J. Bannister, Jr., was drowned in said pond on June 19, 1929, and that the plaintiff has been appointed administrator of his estate.

"5. It denies all other allegations contained in the complaint except those expressly admitted herein.

"6. As a further defense, the defendant alleges that T. J. Bannister, Jr., was an intelligent boy; that at the time of his death he was engaged in swimming and in playing in said pond without the knowledge or consent of this defendant; that he was without any right to play or swim in said pond and was a trespasser; that at the time of his death he was engaged in a contest to see how long he could keep his head

under the water; that in doing so he became strangled or incapacitated in some way and his death was the result; that his own careless, negligent and wrongful conduct contributed as the proximate cause of his death."

The case was tried at the February, 1931, term of said Court before his Honor, Judge John S. Wilson, and a jury, resulting in a verdict for the plaintiff in the sum of $3,000.00 actual damages and $1,000.00 punitive damages. A motion by the defendant for a new trial being refused, from entry of judgment on the verdict, the defendant has appealed to this Court.

Appellant presents several exceptions, but under the view we take of the case it is only necessary to consider the questions raised by the exceptions imputing error to his Honor, the trial Judge, in overruling defendant's motion for direction of a verdict. Following in part the outline of the appellant, these questions may be stated as follows:

"(1) That there was no evidence of negligence on the part of defendant operating as a direct and proximate cause of the death of the deceased.

"(2) That there was no evidence of an invitation, either express or implied, on the part of defendant for boys to enter its premises and swim in the pond.

"(3) That the only reasonable conclusion to be drawn from the testimony was that the deceased assumed any risks involved in swimming in the pond.

"(4) That there was no evidence of recklessness or willfulness on the part of the defendant."

In support of his position and as authority for the ruling of the trial Judge in refusing appellant's motion for direction of a verdict, the respondent cites the following cases: *Franks v. Southern Cotton Oil Company,* 78 S. C., 18, 58 S. E., 960, 962, 12 L. R. A. (N. S.), 468; Id., 83 S. C., 342, 65 S. E., 339; *Renno v. Seaboard Air Line Railway Company,* 120 S. C., 26, 112 S. E., 439, 445; *Pigford v. Cherokee Falls Manufacturing Company,* 124 S. C., 390,

117 S. E., 419, 420; *Hart v. Power Company,* 157 S. C., 186, 154 S. E., 118, 124. Respondent quotes from these cases as follows:

"To maintain upon one's property enticements to the ignorant or unwary is tantamount to an invitation to visit and to inspect and enjoy." *Franks v. Sou. Cot. Oil Co., supra.*

"Liability in the turntable cases is strictly put upon the ground of implied invitation to children, to come upon the premises in order to play there, the invitation being supposed to arise from the attractive nature of these dangerous engines." *Renno v. S. A. L. Railway Co., supra.*

"The issue of the defendant's negligence in maintaining a reservoir upon its premises, alluring to immature children, known to be dangerous and insufficiently protected against their depredations and consequent injury, was properly submitted to the jury." *Pigford v. Cherokee Falls Manufacturing Co., supra.*

"That the creation and maintenance upon one's property of such an instrumentality or enticement to the 'ignorant and unwary' is tantamount to an invitation to visit, inspect, and enjoy, and under such circumstances the duty to 'endeavor to protect from the dangers of the seductive instrument or place follows as justly as though the invitation to the ignorant and unwary had been expressed." *Hart v. Power Co., supra.*

The case of *Franks v. Southern Cotton Oil Company, supra,* was before this Court twice; the first time on appeal from an order overruling a demurrer, and the second time from a judgment on a verdict for the defendant rendered under direction of the trial Judge. In the first appeal the question involved, assuming the allegations of the complaint to be true, was whether or not the defendant owed a duty to the deceased, a small boy of tender years, under ten years of age, in regard to the reservoir involved in that case. The plaintiff alleged, in addition to other mat-

ters, that the defendant *"maintained* and *used* in connection with its oil mill * * * a *large* and *deep reservoir,* which it *kept filled with water,* to be used in connection with the said oil mill, said reservoir being located in an open field, near the public highways, streets, and many of the residences of the City of Laurens, where *children* of *tender* years were accustomed to resort for play, the said reservoir being *not protected by a fence, guard,* or *otherwise,* but *was exposed* and *easily accessible* to *children,* who, not knowing of the danger, made use of it as a place of amusement"; and that the defendants permitted the reservoir to remain uninclosed and "unprotected in any way." (Emphasis ours.) Assuming these allegations to be true, which the Court was bound to do in considering the demurrer, this Court held that a cause of action was alleged; that under the allegations the defendants owed a duty to the deceased, in regard to the reservoir in question, and sustained the lower Court in overruling the demurrer. Thereafter, upon trial of the case in the lower Court, upon motion of the defendant, the trial Judge directed a nonsuit upon the ground that there was no testimony tending to sustain the material allegations of the complaint. As stated in the opinion rendered in the case, the main question involved in the appeal which the Court considered was "whether there was any testimony tending to show that the defendants had notice of the facts alleged in the complaint, or knowledge of such facts as were sufficient to put them on inquiry, which, if pursued with due diligence, would have led to knowledge of the facts." The Court held that there was testimony to show such notice and thereupon remanded the case for a new trial. It seems to have been conclusively shown that the reservoir in question, which was maintained and used by defendants, was large and deep, was kept filled with water by the defendants, and known to be dangerous; was near the street where many people resided and was easily accessible where many children often went for amusement. It was not fenced, was uninclosed, and

unprotected in any way whatsoever. The facts in the case at bar are very different.

In the case of *Renno v. Seaboard Air Line Railway Company, supra,* the facts and conditions surrounding the reservoir in question in that case are set forth in the following language which we quote from the complaint in the cause:

"(4) That a long time prior to the 28th day of July, 1919, the defendant Seaboard Air Line Railway constructed, or caused to be constructed, on its main line of railway, at or near the village of the Lydia Cotton Mills, and over a running and natural stream of water, a fill with culvert or viaduct to carry the water through said fill, and the said fill with culvert or viaduct was so carelessly and negligently constructed that the said culvert or viaduct was not of sufficient size to carry the water through said fill, and, when the said stream was swollen by rains, it caused the water from said stream to rush through said culvert or viaduct with such terrific force that the said water cut or caused to be washed out on the lower side of said railroad track, and on the defendant Seaboard Air Line Railway's right of way, a hole which formed a pool of water, which hole and pool of water has grown in size from year to year, until on or about the 28th day of July, 1919, it was some 25 feet long, 12 feet wide, and ranged in depth from a few inches to 8 or 10 feet in places.

"(5) That said hole and pool of water is located in or near the thickly populated settlement of the Lydia Cotton Mills village, *and is not protected by a fence or guard of any kind or otherwise,* and is easily accessible to children, who, not knowing the danger, made use of it as a place of amusement." (Emphasis ours.)

These allegations of fact, established in the *Renno case,* are not similar to the facts in the case at bar, and, under our view, that case does not control the case at bar.

The facts involved in the case of *Pigford v. Cherokee Falls Manufacturing Company, supra,* cited by respondent,

are not stated in the opinion. The judgment was simply affirmed on the authority of the *Renno case*. The case of *Hart v. Power Company, supra,* involved recovery for the death of a boy who was killed by coming in contact with defendant's high-power electric wires when he climbed up an unguarded electrical transmission tower, constructed and maintained by the defendant in connection with its business. The proof clearly showed that the place in question was often visited by the children of the surrounding community where they went to play from day to day and had their playhouses at the foot of said tower; that the tower up which the boy climbed was constructed in such a manner that it enabled a child to climb the same easily; and, further, there was convincing evidence that the defendant knew that the children frequented the place where they had their childish sports and did nothing by way of guarding or protecting the place.

There is a marked contrast between the facts involved in the above-named cases, cited by respondent, and the facts in the case at bar, which, in substance, may be stated as follows:

The pond or body of water in question is situated a considerable distance from the defendant's plant and cannot be seen from said plant except from the upper stories of the buildings of the same, and is in a pasture maintained and used for the purpose of pasturing the cows kept by defendant's employees. The playground referred to in plaintiff's complaint, which is maintained by the defendant for the benefit of the children of its employees, is far removed from the said pond, about six hundred feet away, and is separated from said pasture by a high railroad embankment, and several railroad tracks. In addition, the pasture in which the pond is located is inclosed by a barbed-wire fence, consisting of three strands, and has no connection with the playground mentioned. The pond, which furnishes a watering place for the cows placed in the said pasture, has been there for

many years. In fact, no witness was able to state positively how long it had been there. One witness said it had been there ever since he knew anything of the place and that he had known the place for twenty-eight years. This witness could not give any definite information as to the cause of its being there. Some of the witnesses for the plaintiff described the pond as having been dug out, but when questioned they were unable to give any definite information about it; that is, as to whether or not it was a natural pond or an artificial pond. While some of the plaintiff's witnesses stated there was dirt several feet high around the pond, these witnesses also stated that they knew nothing of the place until about ten or twelve years ago, and, since it was clearly proven that the pond has been in existence for many years, long before these witnesses knew of the place, their statements cannot be considered of any assistance in determining whether or not the pond was artificially created, as contended by the plaintiff-respondent or a natural water place, supplied by springs, as contended by the defendant. The appellant contends, and the contention is well supported by the evidence, that the water in the pond is spring water and that there is no inlet to it except underground springs which supply the water for it, and that the pond never goes dry; further, that the water therein is suitable for the cows in the pasture to drink and is always clear, except when a branch, outside of the pasture, which conveys polluted water from disposal plants in that locality, overflows and covers the pasture. In this connection we may state, however, that a decision of the case does not depend upon whether the pond in question was constructed by digging a hole in the ground or was formed and supplied by means of fresh water from underground springs. We may further add that it clearly appears from the record that the pond was in existence long before the defendant came in possession of the premises on which it is located (it was 1909 or 1910), and is in practically the same condition now as it was then. It also clearly

appears from the record that it was against the rules of the defendant for boys to use the pond as a swimming place or to go there for any other purpose, and this fact was generally known, and admitted by plaintiff's witnesses. The plaintiff used a large number of boys as witnesses who stated that they had been in the pond, and stated that they did so in spite of the fact that they knew it was against the rules to do so, and in spite of the fact that some of them were punished by their parents for their acts in going to the pond. Furthermore, it is established by the evidence that when the boys wanted to go to the pond they did so in a hidden way, "slipped" there, knowing at the time that if they were seen in the pond, at the pond, or in the pasture they would be chased away by the police officer or guards at the defendant's plant who had instructions to keep the boys out, and it also clearly appears from the record that these guards made an effort to carry out such instruction. So far as the record discloses, the pond could not be said to be such a dangerous place. It is somewhat in basin shape, shallow around the edge and gradually increasing in depth toward the middle; but even in the deepest place it is not very deep, possibly slightly over the heads of the smaller boys. An elder brother of the dead boy stated in the course of his testimony that the water in the deepest places came up to his neck.

The plaintiff's intestate, at the time he lost his life in the pond, was twelve years of age, and, while he was not as large as other boys of his age, he was, according to the only reasonable view of the testimony, of average intelligence. His elder brother testified to that effect. The accident occurred about 7 o'clock in the evening. According to the evidence, the young man was in the pond with several other young fellows. They were playing, ducking their heads under the water and seeing how long they could keep their heads under the water. The record does not show who was there at the moment of the accident. Some of the boys, it seems, went away, leaving him there, and very soon it was reported

that he had been drowned or was missing. No one seemed able to state, or at least did not state, just how he lost his life, but his body was discovered under the water near the middle of the pond. As we understand respondent's contention before this Court, he contends that the pond in question is a dangerous nuisance, and that the same could and should have been abated in one of three ways, i. e.: (1) The pond should have been filled up with dirt and thus destroyed; (2) a ditch should have been dug leading from the pond to the branch referred to for the purpose of draining all of the water out of the pond; (3) a close barbed-wire fence should have been constructed immediately around or over the pond so as to make it absolutely impossible for a boy to get through the wire into the pond, leaving a very small portion outside of the inclosure for the cows to drink from. As to the first proposition, demanding that the pond be filled up with dirt, we deem it only necessary to refer to the fact that the pond is used for the purpose of furnishing a watering place for the cows placed in said pasture by the employees of the defendant. As to the second proposition, requiring the pond to be drained by means of a ditch to the branch referred to, that also would take from said employees the watering place for their cows, and, in our opinion, is not a reasonable demand, and under the established facts could not be done. As to the third proposition, requiring the defendant to construct a close barbed-wire fence around or over the pond so as to make it impossible for a boy to get into the pond, and at the same time leave a small portion outside for the cows to drink from, in our opinion, that proposition is hardly practicable, especially if many cows are pastured in the pasture. Furthermore, it is difficult to understand how the wire could be so constructed around the pond as to make it absolutely impossible for a boy to go through, under or over. But the decision of the appeal in this case does not rest upon the answer to either of these questions. In our opinion, the only reasonable inference to

be drawn from the testimony in the case is that there was no evidence of negligence on the part of the defendant operating as a direct and proximate cause of the death of the deceased. As we view the record the defendant in the case at bar should not be required to exercise any higher duty or to take any greater precaution, under the facts of this case, than was declared by this Court in the case of *McLendon v. Hampton Cotton Mills,* 109 S. C., 238, 95 S. E., 781, in which case the opinion was written by Mr. Justice Hydrick. Because of the applicability of that case to the case at bar we quote at length therefrom:

"Plaintiff was an employee of defendant, and resided in the mill village several hundred yards from the reservoir. In August, 1915, his little boy, Victor, who was six years and ten months old, and several other boys were passing the reservoir, when Victor proposed to them that they climb over the fence surrounding it and go in wading. They did so, and Victor stepped into a deep place and was drowned.

"The liability of defendant is put upon the ground that the reservoir was not properly safeguarded. There is no dispute about the material facts. The reservoir was surrounded by a fence, between four and five feet high, built of farm wire, with meshes about three inches in size at the bottom and increasing in size at the top. It had a wide plank for a baseboard and a 2x4 scantling for a top rail. It stood on the top of a sloping embankment six or eight feet high, which made the retaining wall of the reservoir. It was easy for a boy of Victor's age to approach and climb over the fence. But it was generally understood by the children of the village that they were not allowed to go inside the inclosure; and, while there were occasional violations of this prohibition, whenever children were seen inside the fence they were driven out by the company's watchman, who was also the village policeman, or by other employees who saw them. About three weeks before the accident, plaintiff saw some

boys in there fishing, and took the occasion to warn Victor never to go in there.

"There was testimony that the wire had been broken loose from one of the posts and pulled down so as to make it easier to get over the fence at that place, and that there was a hole in the bottom of the fence at another place large enough for a boy to get through, and that the gate, which was usually kept shut and fastened, was occasionally found open. But, conceding negligence in these respects, it cannot affect the decision, for it was not the cause of the injury, since the undisputed evidence is that the boys climbed over the fence where it was in good condition.

"The question is not whether defendant should have provided a reasonably sufficient safeguard against the probability of injury resulting to children of the village who were too young to understand and appreciate the danger of going into or about the reservoir. That question was thoroughly considered and settled by the decision of this Court in *Franks v. Cotton Oil Co.,* 78 S. C., 10, 58 S. E., 960, 12 L. R. A. (N. S.), 468, and the principle there announced has been followed in several subsequent cases. *Hayes v. Power Co.,* 95 S. C., 230, 78 S. E., 956; *Tucker v. Cotton Mills,* 95 S. C., 302, 78 S. E., 890, and [Id.], 96 S. C., 466, 81 S. E., 182.

"In the *Franks* and *Tucker cases,* children were drowned in reservoirs which were not fenced at all. In the *Hayes case,* the Court considered the question of properly safeguarding against a much greater danger—wires carrying a deadly current of electricity which were easily reached by the injured boy through a window in the transformer house which had been negligently left open. It is not necessary now to decide whether the rule of the *Franks* and *Tucker cases,* which was applied in thickly settled communities, should or will be extended to artificial bodies of water created in sparsely settled communities. For what is and what is not negligence depends so much upon the circumstances that no

inflexible rule can be laid down by which all cases may be determined.

"As pointed out in the opinion in the *Franks case,* the rule there adopted is an exception to the general rule applicable to adult trespassers. It is based upon the just and humane principle that one who created upon his own premises a thing which is naturally attractive to children and at the same time dangerous to them, or which, although it may not be especially attractive to them, yet if left exposed where they are likely to come in contact with it, and their doing so is fraught with obvious danger to them should anticipate their childish proclivities and exercise reasonable care to safeguard them from injury that otherwise would probably result. The exception is made in favor of children of tender years, because they are presumed to be incapable of understanding and appreciating the dangers into which they are led by their childish instincts.

"But though this rule is just and humane, it should not be applied so as to impose unreasonable burdens or liabilities upon the owner or occupier of land in such cases. It does not make him an insurer of the safety of his neighbors' trespassing children. He is not bound to make their trespasses or their injury impossible. If he takes such measures or precaution as an ordinarily prudent person should take under the circumstances, and such as ought to be sufficient to prevent injury to children of normal instincts, proclivities, and training, he satisfies the requirement of the law. There are some children in nearly every community who are abnormally mischievous and disobedient, who not only defy parental authority, but public authority as well, and set at naught all reasonable rules and regulations, and seek to overcome every obstacle to the accomplishment of their willful purposes. But the purpose of the rule is to save the child of ordinary and normal instincts and training from the consequences of that inadvertence or thoughtlessness which is natural to childhood. Therefore the landowner is not bound

to erect a barrier which no child can overcome, but only such as is sufficient to safeguard the child of ordinary and normal instincts, habits and training. No Court would hold that a boy who broke the lock with which a turntable was locked and rode on it to his injury could recover damages of the railroad company, because the lock was not such that he could not have broken it.

"The fence erected by defendant in this case was sufficient to safeguard the average normal child of the mill village against the danger of the reservoir. It kept them out, although it was easy for them to climb over a fence one, two, three, or four feet higher. But to hold that the fence must have been such that a boy could not climb over it would be to impose upon defendant the duty of extraordinary care and the liability of an insurer; and no Court has yet extended the rule further than to require ordinary precautions to prevent injury in such cases."

While we have not made specific reference to every question argued or presented by respondent, we have carefully considered the same.

It is the judgment of this Court that the judgment of the Circuit Court be, and the same is hereby, reversed, and the case remanded for the purpose of entry of judgment for the defendant under Rule 27.