14267

HANCOCK v. AIKEN MILLS, INC.

(185 S. E., 188)

December, 1934.

*Messrs. Henderson & Salley,* for appellant,

*Messrs. Williams & Busbee,* for respondent.

March 31, 1936.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

This action was instituted by Leonard Hancock, by his guardian *ad litem,* against the defendant, Aiken Mills, Inc., for the recovery of damages alleged to have been suffered by him on or about February 10, 1933. The plaintiff, at the time of the accident hereinafter referred to, lacked four months of being thirteen years of age. He resided with his parents in the defendant's mill village at Langley, in this State. The defendant owned the mill village and rented one of its houses on the Augusta road to Nish Hancock, the father of the plaintiff. The house next to it was rented to Ed. Christian, an uncle of the plaintiff. The Hancock yard extended to within a few feet of the Christian house, and was separated therefrom by a plum tree hedge.

The chimney of the Christian house fell into disrepair, and on the 10th day of February, 1933, upon the request of Christian, the defendant, through its master mechanic, Cummings, sent J. B. Redd, a brick mason, with Ed. Dorsey, his colored helper, to repair the chimney. The chimney was on the side next to the Hancock house. Redd and his helper set up their mortar box quite near to the Christian house, but actually on the plot of land or yard occupied by the Hancocks, and started the operation of repairing the chimney. Between 7 and 8 o'clock in the morning they built a fire on the Hancock lot, but close to the Christian house, for the purpose of warming themselves. It was bitterly cold and freezing on the day in question, and a high wind was blowing. The plaintiff was severely burned while standing beside this fire, under the circumstances hereafter narrated.

Plaintiff's mother and father worked upon the night shift in the Clearwater mill, and slept in the daytime. While plain-

tiff's parents were working and sleeping, his aunt kept house and looked after him. He attended the Langley school and was in the fourth grade. On the day of the accident plaintiff was kept home from school by his aunt because he was sick with a cold, and had been given medicine for it. Shortly after the fire was built, the plaintiff went into the yard, while his parents were asleep and while·his aunt was about her household duties, as stated by him, to get some water, when Redd called to him and sent him upon an errand to the grocery store across the street. After running the errand the plaintiff returned and stood by the fire in the yard. Up to this point there is no dispute, but from this point the testimony diverges. Dorsey, the Negro helper, stated that the plaintiff came to the fire the first time about 7:15 o'clock that morning, and was about and around the fire until about 10 o'clock. Redd testified that the plaintiff came to the fire several times and warmed himself. While he was standing by the fire his overalls became ignited below the knees of both legs, in consequence of which ·he sustained severe burns, which confined him to his home for five or six weeks, but it was several months before his burns completely healed. Other testimony necessary to an understanding of the case will be discussed in connection with the issues involved.

The plaintiff predicates negligence upon the following delicts:

(a) That the defendant trespassed upon the premises occupied by the plaintiff, his parents and aunt, and started an open, unguarded, and dangerous fire thereupon, when it knew, or should have known, that it was a trespasser, that said fire was dangerous to children, and would probably attract plaintiff or other children to it and cause them injury.

(b) That the defendant induced the plaintiff to leave a place of safety, come to said fire, run an errand, and return to said fire, when it knew, or should have known, that it was highly dangerous for plaintiff to be about said open and unguarded fire, and that he was likely to be burned. And

(c) That it was the duty of the defendant, having set in motion said dangerous instrumentality and hazard to little children, to wit, an open and unprotected fire, to warn plaintiff to keep away therefrom, and to exercise due diligence to prevent his coming near enough to be burned; whereas, defendant violated that duty in causing the plaintiff to leave a place of safety and come to said fire, at which time he was severely burned.

The defendant interposed a general denial, and set up the plea of contributory negligence.

Upon trial of the case a verdict was rendered in favor of the plaintiff for $1,000.00, upon which judgment was duly entered. The defendant made timely motions for a nonsuit and for a directed verdict, and the case comes before us on appeal from the orders overruling these motions. The exceptions also assign error to the trial Judge on account of his refusal to charge the jury certain requests submitted by the defendant.

One of the major points in the case is whether or not the defendant company was legally responsible for the fire built by the brickmason, Redd, and his Negro helper, and we will first consider this question.

The appellant contends that there is no testimony tending to prove that it created or maintained the fire in question, and that under the doctrine of *respondeat superior* it cannot be held responsible for its existence.

Under the doctrine of *respondeat superior* it is generally held that the master is liable for the negligent acts or omissions of his servant while acting as such and within the scope of his employment. 39 C. J., § 1486; *Osteen v. S. C. Cotton Oil Co.,* 102 S. C., 146, 86 S. E., 202, L. R. A., 1916-B, 629.

The converse of this proposition is true. The master cannot be held liable under this doctrine for the negligent acts of omission of the servant when not acting within the scope of his employment. *Moore v. Columbia, etc., R. Co.,* 38 S. C., 1, 16 S. E., 781. The test as to the

liability of the master is whether the servant was guilty of negligence in the doing of his master's work. It is the character of the employment, and not the private instructions given by the master to the servant, that must determine his liability. See monographic note to *Goodloe v. Memphis, etc., R. R. Co.,* 54 Am. St. Rep., 82. What is the scope of a servant's employment may be determined by implication from the circumstances of the case. Monographic note to *Ware v. Barataria, etc., Canal Co.,* 35 Am. Dec., 192.

It is generally held that the act of a servant done to effect some independent purpose of his own and not with reference to the service in which he is employed, or while he is acting as his own master for the time being, is not within the scope of his employment so as to render the master liable therefor. Under these circumstances the servant alone is liable for the injury inflicted. If the servant steps aside from the master's business for some purpose wholly disconnected with his employment, the relation of master and servant is temporarily suspended; and this is so no matter how short the time, and the master is not liable for his acts during such time. 39 C. J., § 1490, page 1295. *Marlowe v. Bland,* 154 N. C., 140, 69 S. E., 752, 40 L. R. A. (N. S.), 1116; *Morier v. St. Paul, etc., Ry. Co.,* 31 Minn., 351, 17 N. W., 952, 47 Am. Rep., 793.

No general rule can be formulated which will determine in each case whether the servant was acting within the scope of his employment. The rule may be deduced from the authorities that an act is within the scope of the servant's employment where reasonably necessary to accomplish the purpose of his employment, and in furtherance of the master's business.

Applying these principles of law to the facts in this case, we do not think that the Court can say as a matter of law that in building the fire the servants of the defendant were acting outside of the scope of their employment. The test is whether or not the building of the fire was reasonably implied from the character of the work,

the nature of the employment, and the duties incident to it, under the facts of the case.

The testimony shows that the weather was bitterly cold; it was raining and freezing, and there was a high wind. The master mechanic for the defendant testified that: "It is the general custom for bricklayers to build fires in cold weather so as to warm themselves. This day was very cold and the pipes were freezing. The building of such a chimney as this is outside work altogether. You have to handle brick and mortar, and they are very cold things." He further testified: "Mr. Redd was working for the company, and was about the company's business. Mr. Redd was in charge of the work, and was over the colored worker employed there. He had authority to order the Negro to take up brick and cement, and anything else necessary on the house to fix the chimney." And further: "A fire is unnecessary to the work, even in cold weather. If a man wants to warm himself, or for his own convenience he usually builds one. They do not always build fires, but in the winter time it is the usual custom that they build fires to warm by. I could not say that all bricklayers build fires. * * * I did not say that it was absolutely necessary to have a fire to warm up by. * * * If I had stayed outside I would probably have been too uncomfortable to have done much work. A brick mason would have been very uncomfortable. He would have been very cold without one."

The first act of Mr. Redd and his helper when they went on the job was to build a fire. In the testimony of Mr. Redd, he says: "We built a fire between 7 and 8 o'clock in the morning. It was cold, and I wanted to warm our hands. We built it where we did so we could do our work. * * * It was necessary for the colored man to have the fire because he was working in water and handling water." The record shows that Mr. Redd later in his testimony denied making the latter statement, saying that if he said it, it was a mistake. However, it is for the jury to pass upon contradictions and conflicts in testimony.

The Negro helper, Ed. Dorsey, testified: "I built the fire because I was cold and wanted something to warm by. I did not have to have the fire, but I built it because it was cold."

This testimony is susceptible of more than one reasonable inference, and the trial Judge committed no error in submitting to the jury the issue as to whether or not the creation and maintenance of the fire was the act of the defendant. The question, whether or not this constituted actionable negligence resulting in injury to the plaintiff as a proximate cause, will be later discussed.

It is ably and earnestly contended by the appellant that the facts do not bring the case within the doctrine of the "turntable" and "attractive nuisance" cases. The contention that the doctrine of attractive nuisances has no part in this litigation was specifically made by the defendant's motion for a nonsuit, motion for a directed verdict, and by defendant's fourth and fifth requests to charge. The plaintiff testified unequivocally that he went to the fire simply because Mr. Redd called him there. He was not attracted by the fire itself, but went to it only because Redd called him there on a mission which was not the company's mission. He stated:

"Mr. Redd called me to him and asked me to go to the store and tell Mr. Willie Beard to come down there that he had a small order for him. Mr. Beard runs a grocery store. * * * I told Mr. Bart Beard to tell Mr. Wilile Beard to come down there that he (Mr. Redd), had a small order that he wanted to give him. When I got back Mr. Redd was standing at the fire, and I went to the fire to tell Mr. Redd what Mr. Beard had said. That was what I went to the fire for. I told Mr. Redd that Mr. Beard said that he would tell Willie Beard as soon as he came in. I was standing with my back to the fire and I did not know that I was on fire until Mr. Redd threw me down. My burns are all in front.

"Q. Can you explain how that happened? A. Yes, sir; the wind was blowing mighty hard that day." It is inferred that the wind whipped the fire around him.

The plaintiff further stated that he stood about the fire for 15 or 20 minutes before the accident. The testimony shows that the fire was made from odds and ends, about three feet in length, left over from the building of the scaffold around the chimney.

Mr. Redd testified that he sent the plaintiff to tell Beard, the grocer, "to come down here, that I had a grocery order for him; it was my personal order."

Upon redirect examination, the plaintiff testified: "I would not have gone to the fire if Mr. Redd had not called me. After I came back from Mr. Beard's store I was by the fire fifteen or twenty minutes before I was burned. I saw Mr. Redd put fuel on the fire *but I did not put any on myself or have anything to do with the fire.*"

It is urged by the appellant that the law of attractive nuisances is not applicable to this case inasmuch as the plaintiff did not go to the fire because he was attracted to it in the sense of the doctrine of attractive nuisances, and that the whole truth of the matter is, according to the plaintiff's own testimony, that he went purely because Mr. Redd called him to the fire on a personal matter of Redd's and that he returned to the fire after running the errand to report personally to Redd, and was standing in front of the fire when the high wind whipped the fire in his direction and burned him, with no negligence on the part of the defendant which could have been the proximate cause of his injury.

A careful examination of the authorities in this State and elsewhere leads inevitably to the conclusion, in our opinion, that the appellant is right in this contention. None of the elements usually present in cases involving this doctrine appear from the facts in this case.

It is obvious that upon the trial of the case in the Court below it was tried upon the theory of attractive nuisances. An examination of the trial Judge's charge to the jury clearly shows this. Furthermore, the respondent in his brief states that it was from the principles of law laid down in *Hart v. Union Mfg. & Power Co.,* 157 S. C., 174, 154 S.

E., 118, that the trial Judge in the case at bar charged the jury; and further correctly states that the facts in that case were bottomed wholly upon the law of attractive nuisances. That the case below was tried upon the theory of attractive nuisances is made entirely clear by a reading of the instructions given by the trial Judge to the jury. He states in his charge, and it appears therefrom, that he read the law announced by this Court in that case *verbatim.*

Beginning with *Bridger v. Asheville & S. R. Co.,* 25 S. C., 24, it appears that our Court has considered the doctrine of attractive nuisances involving injuries to children in the following cases: *Franks v. Cotton Oil Company,* 78 S. C., 10, 58 S. E., 960, 962, 12 L. R. A. (N. S.), 468; *Hayes v. Power Co.,* 95 S. C., 230, 78 S. E., 956; *Tucker v. Clinton Cotton Mills,* 95 S. C., 302, 78 S. E., 890, also *Id.,* 96 S. C., 466, 81 S. E., 182; *Sexton v. Construction Co.,* 108 S. C., 516, 95 S. E., 129, 131; *McClendon v. Hampton Mills,* 109 S. C., 238, 95 S. E., 781; *Renno v. S. A. L. Ry.,* 120 S. C., 7, 112 S. E., 439; *Pigford v. Cherokee Falls Mfg. Co.,* 124 S. C., 389, 117 S. E., 419; *Hart v. Union Mfg. Co., supra; Bannister v. E. W. Poe Mfg. Co.,* 162 S. C., 1, 160 S. E., 138.

The cases of *Haithcock v. Columbia,* 115 S. C., 29, 35, 104 S. E., 335, and *Morris v. Langley Mills,* 121 S. C., 200, 113 S. E., 632, 36 A. L. R., 302, although not directly involving the doctrine of attractive nuisances, discuss kindred principles. A careful analysis of these decisions, with the exception of the *Sexton case* and the *Haithcock case,* shows definitely that in each of these cases the child that was injured or killed was attracted to play with or play in, or swim in, or wade in, the instrumentality that brought about its injury or death.

In the *Sexton case* the plaintiff recovered a verdict. This Court held that the motion made for a nonsuit should have been granted and dismissed the complaint. The facts in the *Sexton case* disclose that the plaintiff, a small boy, was in the habit of going to a sand pile in a vacant lot to play with

other children. A pot of boiling asphalt was kept about 100 feet from the sand pile. While the child in question was passing near the asphalt pot in leaving the playground, he was injured by coming in contact with hot asphalt, caused by the defective condition of a pipe connected with the pot. The Court held, however, that inasmuch as the child was not *attracted* by the pot of asphalt but by the sand pile alone, the doctrine of attractive nuisances did not apply, and that the plaintiff could not recover. The Court said: "The dangers which the defendant was required reasonably to anticipate, and to safeguard, were such as related to contact by children with the pot, while pursuing their youthful instincts for amusement. The plaintiff, however, was not playing with the pot at the time of the injury; nor was his conduct influenced in any respect by reason of the fact that the pot was obviously dangerous on account of its exposed condition. If the plaintiff had been an adult, instead of an infant, merely passing by the pot, he would just as certainly have been injured. The defendant cannot be held liable under such circumstances, without becoming an insurer for the safety of children on his premises. *McLendon v. Hampton Cotton Mills* [109 S. C., 238, 95 S. E., 781]."

In the case of *Franks v. Cotton Oil Company, supra,* the Court uses this quotation from Cooley on Torts: "Thus, leaving a tempting thing to play with exposed where they would be likely to gather for that purpose may be equivalent to an invitation to them to make use of it."

In the instant case, even if the fire should be treated as an attractive nuisance—and we cannot so hold—the lure of the fire was not the thing that attracted the plaintiff. He went to the fire in response to Redd's invitation and request, and that invitation and request was a mere personal one and had nothing whatever to do with the fire.

Many cases from other jurisdictons are in accord with our decisions. Indeed, there is a tragic plethora of cases in the books involving the turntable and attractive nuisance doctrine. It would be a waste of time to review them all. In

*Bogdon v. Los Angeles & S. L. R. Co.* (1922), 59 Utah, 505, 205 P., 571, it was held: Unless the child goes on the property by reason of the temptation of the very instrumentality, which is held to be the attractive nuisance, he cannot recover. *Erie R. Co. v. Hilt, supra,* 247 U. S., 97, 38 S. Ct., 435, 62 L. Ed., 1003; *Giannini v. Campodonico, supra,* 176 Cal., 548, 169 P., 80; *Shaver's Adm'r v. Louisville G. & E. Co.,* 207 Ky., 180, 268 S. W., 1082; *National Metal Edge Box Co. v. Agostini* (C. C. A.), 258 F., 109; *Oleary v. Brooks Elevator Co., supra,* 7 N. D., 554, 75 N. W., 919, 41 L. R. A., 677; *Carr v. Oregon-Washington R. & N. Co.,* 123 Or., 259, 261 P., 899, 60 A. L. R., 1434; *Sweeden v. Atkinson Imp. Co.,* 93 Ark., 397, 125 S. W., 439, 27 L. R. A. (N. S.), 124; *Fusselman v. Yellowstone Valley Land & Irrig. Co.,* 53 Mont., 254, 163 P., 473, Ann. Cas., 1918-B, 420.

Applying the principles announced in these and in our own cases to the facts here, it is perfectly clear that this fire, built by the workmen of the defendant, did not constitute an attractive nuisance. The facts do not make the doctrine of attractive nuisance remotely applicable. There is not the slightest evidence that the plaintiff was drawn to the fire by any childish proclivity for play or amusement, or impelled thereto by any childish instinct. Nor is there the slightest evidence that the fire appealed to the venturesome or curious impulse of the plaintiff.

Because of the tender regard which every right-minded person has for children, and the impulse to protect them from harm, the Courts may sometimes be led to unsound conclusions on questions involving the doctrine of attractive nuisances and injuries to children. The doctrine itself was evolved upon humanitarian grounds, and we think properly so. But even so, in order that justice be done, it is necessary that the facts be dispassionately considered, and settled principles adhered to.

In our opinion, the record shows conclusively that the case was tried solely upon the theory of attractive nuisance.

There being no evidence to support it, a verdict should have been directed for the defendant.

The alleged trespass of the defendant in going upon the property of Hancock and building the fire went out of the case when the presiding Judge charged the jury as follows: "I charge you further that it makes no difference in the case whether the fire in question, if there was a fire there, was on the lot known as the Hancock lot, or whether it was on the adjoining lot."

This charge, unappealed from, became the law of the case. The respondent contends that the testimony of the defendant in the Court below was reasonably susceptible of the inference that the plaintiff was attracted to the fire in question by his childish instincts, that he did play with the fire for his amusement, and that the fire was built and maintained off the premises of plaintiff's father, where the plaintiff had no legal right to be; thus bringing the case within the law of attractive nuisances. This contention has no sound basis. Not only is it totally lacking in evidence to support it, but during the charge to the jury the trial Judge inquired of the defendant's attorneys if there was any admission on their part about which lot the fire was on, and Mr. Henderson, of defendant's counsel, replied, "I think the testimony shows that the fire may have been on, and was on the Hancock lot, owned by the Aiken Mills." And he made the further statement that the defendant did not contend that it was on the adjoining lot. It was following the inquiry and answer that the trial Judge charged the jury that the location of the fire in this case was immaterial.

Then taking the opposite tack, the respondent contends that the plaintiff's testimony was susceptible of the reasonable inference that he was attracted to the fire; that the same was dangerous, known to be so by the defendant, without being guarded by the defendant, and without any effort on the part of the defendant to protect the plaintiff from its danger; that the fire was created and maintained upon the premises of plaintiff's father, in the yard of the respondent,

where the plaintiff had a perfect legal and moral right to be, which would take the case without the law of attractive nuisances.

Even if we assume that this issue fairly arose from the pleadings and the testimony, and go further and hold that it was comprehended in the charge of the trial Judge to the jury, the plaintiff cannot recover, under the evidence in this case, upon the ground of actionable negligence. The testimony on behalf of the plaintiff is to the effect that he was undersized for his age, sickly, and "weasley"; that he was perhaps not quite as intelligent as the average child of his age. But there was no testimony whatever that the defendant's servants knew, or had reason to believe, that he was not a normal child, of nearly 13 years of age, such as would have caused them to have specially protected him from the fire. A reading of the plaintiff's own testimony leaves no doubt that he was quite an intelligent boy. He was far from lacking in intelligence in his answers to the questions propounded to him on the witness stand. It is not claimed by his attorneys that he was an imbecile. It is merely argued that he is backward for his age. His school teacher testified that he was of average mentality, was in the fourth grade, but had not been promoted because of absence from school, which affected his standing. It is inconceivable from the evidence before us that he did not fully realize and appreciate whatever danger there was from standing before a fire, even with a high wind blowing.

It is not in the province of this Court to put words into the mouth of a witness, nor may this Court pass upon the weight and credibility of evidence; but we are at liberty to consider the evidence for the purpose of determining whether or not it is susceptible of more than one reasonable inference. It is obvious that when the plaintiff testified, "I did not know the fire was going to burn me," he merely meant to say, "I did not believe that under the circumstances the fire was going to burn me." He was guilty merely of an error of judgment by standing too close to the fire on a

cold day which resulted in his getting burned. Adults in many an instance have suffered from the same misjudgment.

Knowledge of fire is one of the most common experiences of mankind, and knowledge that fire will burn what it comes in contact with is one of the earliest experiences in life. This knowledge comes before the age of 13 years to the normal child. The testimony is not susceptible of the reasonable inference that the plaintiff was mentally deficient or lacking in judgment.

In this view of the case—actionable negligence— there was no testimony to go to the jury. A fire is *ipso facto* dangerous, and presents a danger that is open and obvious, and not latent.

In our opinion the motion of the defendant for a directed verdict should have been granted upon the ground indicated,

It is the judgment of this Court that the judgment of the Circuit Court be, and hereby is, reversed, and that the case be remanded for entry of judgment in favor of the defendant.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES BONHAM and BAKER concur.

MR. JUSTICE CARTER (dissenting) : Not being able to agree with the conclusion reached in the leading opinion in this case, I most respectfully dissent, and will briefly state my reasons therefor.

I agree with the general propositions of law stated by the writer of the opinion, and, of course, do not question but concede the correctness of the testimony quoted. However, I am unable to agree with the inference to be drawn therefrom with regard to whether or not the fire in question was an attractive nuisance, in the sense alleged in the complaint, and whether it resulted in the injury complained of as a result of the defendant's negligence. As stated in the leading opinion, the trial Judge committed no error in submitting to the jury the issue as to whether or not the creation and maintenance of the fire in question was the act of

the defendant. I am also of the opinion that more than one reasonable inference can be drawn from the testimony as to whether or not said act or acts, creating and maintaining the said fire, "constituted actionable negligence resulting in injury to the plaintiff as a proximate cause." Therefore, in my opinion, the trial Judge properly submitted that issue to the jury. In this connection I call attention to the following testimony of the plaintiff, Leonard Hancock:

"I am fourteen, going on fifteen. I am not in school now. I went to school until I was burned. I don't know how old I was when I started to school. I was in the fourth grade then and was on condition from the third. I can write my name, but not much else. I cannot read much.

"Counsel showed witness a newspaper, and witness stated: 'I can read some of it by spelling some of the words. Some of them I know without studying them. I can write a little and read a little.

" 'I have been sick ever since I can remember. I weighed about seventy pounds when I got burned. The morning I got burned I had been kept home because I was sick. My aunt was looking after me. She had given me some medicine. It was cold weather. How I discovered that there was a fire there was that I went on the back proch to get some water, and I saw it was frozen up and I started to cross the yard to go to the hydrant in the street, and Mr. Redd called me. He was at the fire in our yard. He told me to deliver a message to Mr. Beard which I did, then I came back and delivered the message to Mr. Redd after I had been to Mr. Beard. I came back and stood around the fire fifteen or twenty minutes, I reckon. Mr. Redd was standing up there with me. The Negro was toting water and brick upon the house to fix the chimney with. Mr. Redd never told me to stay away from the fire or that it was dangerous. I got caught on fire. I was standing with my back to the fire. The way I knew I was on fire was that Mr. Redd threw me down and put me out. These are my overalls, and that is where I was burned. I do not know how I got burned on my hands.

I had good fingernails before this happened. It hurt me and made me sore for a long time.'

"Q. Did you know there was danger in your getting burned out there at that fire? A. No, sir.

"Q. Did you ·think the fire would burn you if you stood up by it? A. No, sir.

"Q. Had you ever been burned by a fire before that? A. No, sir.

"Q. That was the first time you had ever been burned? A. Yes, sir."

## CROSS EXAMINATION

"Q. You say you can read some of that paper? A. Yes, sir.

"Q. I didn't understand you—did you say yes? A. Yes, sir. Did you hear—

"Q. You have got sense enough to observe that I am a little bit deaf, and that I could not hear you, and to hoist your voice and ask me if I could hear? A. Yes, sir.

"Q. Still you want this jury to believe that you didn't have sense enough to know if you got too close to the fire it was going to burn you? A. I didn't know the fire was going to burn me.

"Q. Do you want the jury to believe that you didn't have sense enough to know that if you got close to a fire that it would burn you? A. I don't understand you.

"Q. I asked you whether you wanted these twelve gentlemen here to believe that you didn't have sense enough to know that if you got too close to that fire that the fire would burn you? A. Yes, sir.

"Q. You want them to believe that? A. Yes, sir.

"Q. You say you went on the back to see about a hydrant? A. Yes, sir.

"Q. Your Aunt testified that she told you not to go out that day unless the medicine you had taken made you go out to the rear? A. Yes, sir.

"Q. Is that a fact that she told you that? A. Yes, sir.

"Q. What you went to see about was water? A. Yes, sir.

"Q. In other words, you were disobeying your Aunt in going out that morning? A. Yes, sir.  *  *  *"

In this connection we call attention to certain of the plaintiff's testimony quoted in the leading opinion as bearing on the question involved.

In answer to questions as to why his burns were all in front, the plaintiff stated that the wind was blowing mighty hard that day and gave that as the reason for his burns appearing on the front.

It is well to call attention to the following additional testimony by the plaintiff given on redirect examination: "I did not have anything to do with making the fire. Neither Mr. Redd nor Kirkland nor anyone else told me to stay from the fire. Mr. Redd threw it on. I would not have gone to the fire if Mr. Redd had not called me. After I came back from Mr. Beard's store, I was by the fire fifteen or twenty minutes before I was burned. I saw Mr. Redd put fuel on the fire, but I did not put any on myself or have anything to do with the fire. Neither Mr. Redd, Mr. Kirkland nor anybody else told me to stay away from the fire. I first went to the fire because Mr. Redd called me, and would not have gone if he had not called me. After I ran his errand and came back, Mr. Redd did not tell me to get away from the fire. He remained at the fire when I was there. The Negro was carrying up mortar and brick and Mr. Redd was directing him what to do, to take up the mortar and brick. It was very cold that morning."

It is true, under the law of this State the master is not liable for the negligent acts of omission of the servant if such servant is not acting within the scope of his employment at the time involved, and if the plaintiff's injury was caused solely by his compliance with the request of the defendant's servant to effect some independent purpose of such servant, which was not with reference to the service in which said servant was employed, the plaintiff could not recover in this action. But, under my view of the record, more than one

reasonable inference can be drawn from the evidence bearing on this issue, and it was, therefore, proper for the trial Judge to submit such issue to the jury. I think it is clear from the record that the plaintiff was sent by the servant, Mr. Redd, on an errand for such servant, the purpose of which errand was independent of the duties said servant was engaged to perform for the master; but I do not think it is conclusively shown by the evidence that the said compliance by the plaintiff was the sole cause of his alleged injury. It is true that an examination of the plaintiff's testimony discloses testimony to the effect that when he got back from the store referred to by the parties, Mr. Redd, the servant in charge of the master's business, was standing at the fire in question and that he (the plaintiff), went to the fire to tell Mr. Redd what Mr. Beard had said and that that was what he went to the fire for. But, in this connection, I call attention to the fact that the plaintiff was not burned at that time. If the testimony of the plaintiff alone is to be considered, evidently fifteen or twenty minutes passed before he was burned, and if the testimony of the witness Redd, servant of the defendant, is to be considered, and this should be done, perhaps an hour elapsed before the young boy caught on fire. Further, if the testimony of Mr. Redd is to be accepted as true, Mr. Redd, the man in charge of the master's work, was not at the fire at the time the boy returned in performance of his errand, but he (Mr. Redd), was at that time on the house at which the chimney was being repaired. In this connection I quote the following testimony of the witness Mr. Redd, given on cross examination:

"I saw the little boy in the yard a few times before he got burned. *He came to the fire several times. When he came to the fire he stood around and warmed himself.* I told him to get away from the fire.

"Q. Why didn't you make him get away? A. That is not my machine to get myself in a law suit and I didn't want to slap him, and I slapped him when I caught him and put out the fire.

"Q. If you had tried, you could have kept him away from the fire? A. *I was on top of the house,* and I kept telling him not to get too close to the fire and to get away.

"Q. You thought it was dangerous to him? A. No, sir, not at all. It was just a small fire.

"Q. *You did not go and tell his aunt to keep him away?* A. *No, sir. I was rushing to get that job done.* We had to make a hanging scaffold there.

"Q. You claim you told this young man to stay away from the fire and that he might get burned? A. Yes, sir.

"Q. And you say he would not obey you and would not stay away? A. He didn't do it.

"Q. *He came there on a number of occasions to the fire?* A. *Yes, sir.*

"Q. You never did call it to the attention of his parents? A. I didn't see any of them up and around about that day. * * * "

(Italics mine.)

The following is stated in the record as a part of the testimony given on redirect examination of the witness Mr. Redd: "I told the boy that if he saw Willie Beard to tell him to come and see me, and Willie Beard later came. I stood on the ladder at the eaves of the house, and I gave him an order for groceries. When I told the boy about Willie Beard he was passing between the two houses, and I was up on the house, and it was about a half-hour after that that he came back and told me that Mr. Bart Beard said that he (Willie) would be there after a while. *I was up on the house then. It was something like an hour or a half an hour after that that he got burned. It may have been an hour or not so long.* * * * " (Italics added.)

In my opinion, more than one reasonable inference can be drawn from the testimony as to whether the boy's injuries resulted from his coming to the fire in performance of an errand for Mr. Redd, solely for him and independent of any duty being performed in connection with the work of the master, or whether the said injury resulted as the

proximate cause of the negligent acts of the defendant in carrying on the said work, acting through its duly authorized agents. One reasonable inference to be drawn from the testimony is that this boy, the plaintiff, was permitted to hang around the fire for some time, possibly an hour, and that no effort was made during the time to let his parents, or aunt in charge of the said house, know what was taking place. I also think that more than one reasonable inference can be drawn from the testimony as to whether or not the boy's intelligence was sufficient to prevent his recovery in this case, under the facts and circumstances. On direct examination the young lady who taught this boy gave the impression that he was a very bright boy and fully capable of taking care of himself, but on cross examination testimony was brought out which could have caused the jury to reach a different conclusion as to the boy's intelligence. Considering the whole case, it is my opinion that the trial Judge properly sent the case to the jury.

In connection with the views herein expressed, attention is called to the following cases: *Arkansas Valley Trust Company v. McIlroy,* 97 Ark., 160, 133 S. W., 816, 31 L. R. A. (N. S.), 1020; *Keistler Co. v. Aetna Insurance Company, Hartford, Conn.,* 124 S. C., 32, 117 S. E., 70; *Haithcock v. City of Columbia,* 115 S. C., 29, 30, 104 S. E., 335; *Stone v. City of Florence,* 94 S. C., 375, 78 S. E., 23; *Grayhek v. Stern,* 154 Ill. App., 385.

In my opinion, the judgment of the lower Court should be affirmed.