15278

HYDE v. SOUTHERN GROCERY STORES, INC.

(15 S. E. (2d), 353)

264

266

April, 1940.

*Messrs. Thomas, Cain & Black,* of Columbia, and *Messrs. Garvin & Simons,* of Aiken, for appellant,

*Messrs. Gregory & Gregory,* of Lancaster, and *Messrs. Williams & Busbee,* of Aiken, for respondent,

June 10, 1941.

The opinion of the Court was delivered by Mr. Associate Justice Fishburne.

In this action plaintiff sought the recovery of actual and punitive damages against the defendant for the alleged malicious and wrongful attachment of his property, and the trial resulted in a verdict for the plaintiff in the sum of $3,000.00, actual damages. From the judgment entered thereon the defendant appeals.

The attachment proceedings were instituted in the Court of Magistrate G. C. Carnes in Lancaster, South Carolina, against the plaintiff and one Nick Petronis, for the collection of a debt alleged to be due by them to Rogers Stores. All of the legal issues now before the Court on this appeal arose out of the following facts and circumstances connected with that proceeding.

The plaintiff was the owner of a carnival show, and did business in the name of Eric B. Hyde Shows. His paraphernalia consisted of merry-go-rounds, ferris wheels, and various other amusement devices. The equipment included tents, trucks, and other property connected with the show. The winter quarters of the plaintiff were located near the City of Columbia, in Richland County. As was his custom, the plaintiff opened his show in Columbia in the early spring of 1938, for a run of two or three weeks before taking the

road upon a pre-arranged itinerary. In addition to the amusement devices owned and operated by the plaintiff, as a source of revenue he rented space to numerous concessionaires who owned their own equipment and individual businesses. Among these was Nick Petronis, who obtained a concession from the Hyde Shows upon a weekly rental basis for the conduct of a cook tent.

While in Columbia, the Hyde Shows purchased all meats and groceries for their employees from the defendant's store on Main Street, where J. E. Strange was store manager and had supervision of the grocery department, and C. L. Shealy was the manager of the meat department. These supplies were purchased by Mrs. Hyde, the wife of the plaintiff, who paid cash for each and every item bought. There was no charge account, and no credit was asked or extended. The defendant store likewise sold groceries and meats to Nick Petronis, and extended credit to him in the sum of about $100.00. The plaintiff did not request or authorize the credit extended to Petronis, and did not guarantee payment, and had no knowledge or notice of the transaction. It is admitted that the defendant looked solely for payment to Petronis, and that the plaintiff was not indebted to the defendant in any amount at the time the writ of attachment was issued.

After showing in Columbia, Hyde Shows moved to Winnsboro, South Carolina, for one week. While there Mr. Shealy, with the knowledge of Mr. Strange, went to Winnsboro in an effort to collect the indebtedness from Petronis, but failed to make collection. The following week the plaintiff exhibited at Lancaster, South Carolina, under the auspices of the local American Legion Post. About the middle of that week, on April 21, 1938, Mr. Shealy went to Lancaster to again interview Petronis with reference to the indebtedness, which it appears had been incurred for both meat and groceries. Being unable to make collection, he went to the office of Magistrate Carnes and sought a writ of attachment against Petronis and the Hyde Shows. Upon the

advice of the magistrate, and before the writ was issued, he saw Petronis again, the same day, and sought without success to collect the debt. Whereupon, returning to the office of the magistrate, the attachment proceeding was instituted in the name of the defendant, as plaintiff, against Nick Petronis and Hyde Shows. The summons was directed to Nick Petronis and Hyde Shows, and demanded judgment in the sum of $99.99 on account of groceries bought and delivered. When the writ was issued, the defendant gave the statutory bond in the sum of $25.00, with C. L. Shealy as surety. No affidavit in support of the attachment was made on behalf of the defendant.

Under the writ of attachment the magistrate's constable, Mr. Pope, proceeded to the fair grounds, where the show was exhibiting, and served copies of the papers, including the writ, upon Mr. Hyde personally. The writ commanded that he attach and safely keep the property of Hyde Shows and Nick Petronis in Lancaster County. The constable stated to Mr. Hyde that he was then and there attaching all of his property, which included merry-go-rounds, ferris wheels, and other bulky and ponderous amusement devices incapable of physical seizure. When the attachment was made, Mr. Hyde vainly protested that he did not owe the defendant any money. This occurred on Friday. The following day, and on several occasions between that time and Thursday of the next week, the plaintiff protested to the magistrate and sought the release of his property on the ground that he was not indebted to the defendant. He was told that his property was attached under the writ, and the Magistrate forbade to remove it.

Hyde Shows was scheduled to show in Lancaster only one week, and had made arrangements to appear at Chester, South Carolina, the following week. It was not until the middle of the week, however, that Hyde finally secured a bond and obtained a release of his property, so that he was unable to fill the Chester engagement. The day after he filed his bond, Nick Petronis, whose truck had been attached,

paid the magistrate the amount of his debt to the defendant, and. in the view of the magistrate, this ended the case.

In addition to damages alleged to have been suffered by the plaintiff in the way of embarrassment and humiliation, he had to meet a pay-roll of twenty employees for the week he was unable to show at Chester, amounting to $517.00. He claims to have lost a weekly income from eight concessionaries who were under contract to pay him $250.00 He testified to various other items of damage suffered by him by reason of the wrongful attachment of his property.

The defendant assigns various errors to the trial Court because of its refusal to grant its motion for a nonsuit and for a directed verdict.

We will first consider the contention of the defendant, that it should not be held liable because Shealy, the manager of its meat department, was without authority to institute the attachment proceedings in its name, and that in so doing he was acting outside of the actual scope of his employment. It is argued by the defendant that not only was Shealy acting without authority and contrary to express instructions, but that he was effecting his own independent purpose in suing out the attachment.

Under the doctrine of *respondeat superior,* it is generally held that the master is liable for the wrongful acts of his servant while acting as such within the scope of his employment. The principle may be deduced from the authorities that an act is within the scope of a servant's employment where reasonably necessary to accomplish the purpose of his employment and is in furtherance of his master's business. *Lazar v. Great Atlantic & Pacific Tea Co.,* S. C., 14 S. E., 560, opinion filed April 30, 1941; *Hancock v. Aiken Mills,* 180 S. C., 93, 185 S. E., 188; *Cantrell v. Claussen's Bakery,* 172 S. C., 490, 174 S. E., 438.

The primary test to determine a master's ability for an act of his servant· is, whether the servant committed a wrongful act in the doing of his master's work. It is the character of the employment, and not the

private instructions given by the master to the servant, that must determine his liability. *Hancock v. Aiken Mills, supra.*

If the servant is performing some act in furtherance of the master's business he will be regarded as acting within the scope of his employment, although he may exceed his authority. If there is doubt as to whether the servant in injuring a third person, was acting at the time within the scope of his authority, the doubt will be resolved against the master, at least to the extent of requiring the question to be submitted to the jury for determination. *Cantrell v. Claussen's Bakery, supra*; *Matheson v. American Telephone & Telegraph Co.,* 137 S. C., 227, 135 S. E., 306; 39 C. J., 1283, 1284.

In our opinion, under the foregoing principles of law, it may reasonably be inferred that Shealy who was not a mere subordinate servant, was acting within the scope of his employment, and in furtherance of the defendant's business, even though he committed a grave error of judgment, and may have exceeded his authority.

We recognize the soundness of the proposition that the act of a servant done to effect some independent purpose of his own, and not with reference to the service in which he is employed, is not within the scope of his employment so as to render the master liable therefor. Under these circumstances, the servant alone is liable for the injury inflicted. If the servant steps aside from the master's business for some purpose wholly disconnected with his employment, the relation of master and servant is temporarily suspended, and the master is not liable for his acts during such time. *Hancock v. Aiken Mills, supra.*

The question then is, was Shealy at the time he sued out the writ of attachment acting in an individual capacity, and bent upon an independent purpose of his own, or was he acting with reference to the service in which he was employed, and in furtherance of his master's business?

There is no evidence that the business of the defendant's store in Columbia was conducted wholly upon a cash basis. The contrary is true. Mr. J. F. Alman, the defendant's meat market superintendent, and Shealy's superior, testified that Shealy's duty as meat market manager in the Columbia store, was not only to sell, but to collect; and it is entirely plain that when Nick Petronis was extended credit on both sides of the store, for meat and groceries, it was Strange's duty and Shealy's duty to see to it that the bill was paid. After Shealy had sued out the writ of attachment at Lancaster, he returned to the Columbia store and told Mr. Strange, the store manager, that he had attached the property of Petronis. Strange expressed no objection to the procedure, but said that he had not been informed that the Hyde Show had been included in the attachment proceeding. Shealy was not in attendance at the trial, so that the jury did not have the benefit of his testimony.

There is no indication from the evidence that Shealy had been wronged personally, or that he had any grievance against the plaintiff. Neither does it appear that he was in any way acting for himself in his effort to collect the debt. It is not suggested that he had violated any rule of the defendant by selling on credit, or that he would have to make good out of his own pocket any loss to the defendant by reason of non-payment of the account. No reasonable inference may be drawn that he had stepped aside from the master's business for some purpose wholly disconnected with his employment. Every intendment of the evidence is to the contrary.

It is contended that there was no actual seizure or manucaption of plaintiff's property by virtue of the writ, the proof showing that the plaintiff at all times remained in possession thereof.

It is not always essential to the validity of a levy of attachment that the attaching officer lay hands upon or remove the property attached, especially where such property is of such cumbersome nature that its manu-

caption and removal would be attended by greater expense or difficulty. It is deemed sufficient in such case if he assumes control of and exercises dominion over it. *Seibels v. Northern Cent. R. Co.,* 80 S. C., 133, 61 S. E., 435, 16 L. R. A. (N. S.), 1026. Or, as it has been expressed in many cases, he must do some act for which he could be successfully prosecuted as a trespasser if it were not for the protection afforded him by the writ. 4 Am. Jur., § 537, p. 877, 7 C. J. S., Attachment, § 221, p. 397.

In order to constitute a valid levy of execution on personal property, there must be an intent upon the part of the officer not only to control the property, but he must in addition have the power to exercise dominion over it at the time of the attempted levy. Such intent to control may be indicated by an assertion of dominion, or by some overt act equivalent to an assertion of dominion under claim of right and authority derived from the process in his possession. 21 Am. Jur., § 108, p. 58.

The general rule under which a constructive seizure of personal property sought to be subjected to a levy of execution is sufficient, is particularly applicable to property of a ponderous or bulky nature. In this case we think the question was properly left to the jury. If a man is injured in his credit and reputation and his business lessened or broken up, it can make no difference in his right to recover for such injury that his property has not been actually seized.

The magistrate's constable, armed with the writ, went to the fair grounds in Lancaster, where the defendant was showing, viewed his paraphernalia and equipment, and specifically told Mr. Hyde that all of the property was attached. It is true that he permitted the defendant to retain possession of and use his amusement devices, subject to the attachment, but this did not vitiate the attachment. The plaintiff was likewise warned by the magistrate not to move the property or take it away. Under the foregoing principles of law, and under the circumstances in this case, the levy, in our opinion, as between the parties, was valid.

It is asserted that the attachment was irregular and defective because not supported by an affidavit, and that therefore the plaintiff was not required to surrender the possession or control of his property thereunder. It is argued that if he elected to consider his property subordinated to process that was a nullity, he could not thereby acquire a cause of action against the appellant.

One who takes the property of another, or exercises ██ ██ dominion or control over it without right, whether under color of official authority or otherwise, is guilty of a wrongful and tortious act. This is true as well where the property is taken under a supposed claim or right, as where the taking without knowledge of the wrong, since in either case the trespasser acts at his peril. The fact that the attachment was irregular or void will not screen the defendant from liability for wrongful attachment. Nor may such fact be shown in mitigation of damage. 5 Am. Jur., § 1000, p. 201.

Where the process or attachment is irregular, unauthorized or void, a levy made by the officer renders the party suing out the attachment a trespasser, since under such circumstances the officer becomes the agent of such party. 7 C. J. S., Attachment, § 503, p. 661. And where an attachment is for any reason void, the attachment plaintiff will be a trespasser *ab initio* and liable to the attachment defendant for any damages proximately resulting therefrom. 7 C. J. S., Attachment, § 504, p. 661.

It follows that even though the warrant of attach-██ ment was void because of the absence of an affidavit to support it, the damage was done to the plaintiff when the levy was made and his property rights were molested and interfered with.

Defendant argues that the burden of proof that the attachment in the first cause was vacated and the suit terminated favorably to the plaintiff was not met; that proof of a favorable termination was a condition precedent to the institution of the present action.

According to the general rule, no action lies until the attachment proceedings proper, as distinguished from the main action have terminated. At least the particular property seized must be discharged from the process. The dissolution of the attachment proceedings gives the right of action, and it is not necessary to wait until the termination of the main action before instituting proceedings for redress. 5 Am. Jur., § 988, pp. 193, 194.

It will be kept in mind that the attachment proceedings were brought in a magistrate's Court, which is not a Court of record, and where the rules of procedure unless controlled by statute, are more or less informal. The magistrate testified that the day after Mr. Hyde filed his bond and obtained the release of this property, Nick Petronis paid to him the full amount due to Rogers Stores. The magistrate had the original sales slips showing the credit items, which had been given to him by Mr. Shealy, and on these sales slips he entered the notation that they were paid on April 29th, under which he signed his name as magistrate. He made a similar notation and endorsement on the summons. He then placed all of the papers in the special pigeon-hole of his desk which he used as a receptacle to file papers in cases which had been ended or settled. The magistrate stated that he regarded the case as ended when payment in full had been made. On the same day he forwarded his personal check to Rogers Stores in the City of Columbia, payable to the order of Rogers Stores, in the sum of $104.99. This check carries the notation, "account Nick Petronis, also Hyde Shows," and it was endorsed for deposit by the defendant, and the money collected.

The Circuit Judge in his instructions to the jury charged as a matter of law that under the evidence the attachment proceedings in Lancaster County had been terminated favorably to the plaintiff before the institution of the present action. We are in full accord with his conclusion. After the money was paid, nothing more was heard from the present defendant, who was the plaintiff in the attachment proceed-

ing. The defendant never did have any ·claim against Mr. Hyde. So that when the real debtor, Nick Petronis, discharged his debt by payment, the action was settled and terminated. It would have been an empty formality for the magistrate to have entered a formal order declaring the case ended.

Was there proof of malice on the part of the defendant, or lack of probable cause for the institution of the attachment proceeding?

Malice may be inferred from want of probable cause; it may be inferred· from facts and circumstances.

Probable cause is said to consist in a reasonable belief in the existence of facts necessary to sustain an attachment, such belief being founded on circumstances which would be sufficient to produce such a belief in a man of ordinary caution, that is, founded upon reasonable grounds. 5 Am. Jur., § 986, p. 192; *Jennings v. Clearwater Mfg. Co.,* 171 S. C., 498, 172 S. E., 870; *Baker v. Hornik,* 57 S. C., 213, 35 S. E., 524.

There was an abundance of testimony from which it might reasonably be inferred that there was an utter lack of probable cause for the institution of the attachment proceedings against ·Mr. Hyde. It is admitted without qualification by the defendant that Hyde Shows was not indebted to the defendant in any sum whatsoever. It is likewise admitted that the.defendant knew that the debt sued upon was the individual obligation of Nick· Petronis, and that Mr. Hyde was not in any way connected with it.

Under the admitted facts, the question of malice and probable cause was properly left to the jury.

The defendant contends that it was the duty of the Court to hold, and to charge as a matter of law, that the burden was upon the plaintiff to minimize his damages. The Judge instructed the jury that it is the duty of any person injured or damaged by the wrongful conduct of another to do that which a man of ordinary.care and pru-

dence under similar circumstances would do to minimize his damages. This instruction is in accordance with the law, and was given upon the verbal request of defendant's counsel. It was a question for the jury to determine whether Mr. Hyde's conduct measured up to that of a man of ordinary care and prudence under similar circumstances.

It seems to be the settled rule that if the owner of property wrongfully attached is financially able to do so he must procure the release or return of his wrongfully attached property by giving a bond, thus reducing the damages resulting from the wrongful attachment.

The record is not lacking in evidence, and inferences arising therefrom, tending to show that Mr. Hyde while at Lancaster was financially embarrassed. During his week there receipts were not gratifying, due to bad weather. But he testified that if his property had been unmolested he could have moved his show to Chester with his own help and motor trucks. He succeeded in obtaining bond in less than a week after the attachment had been served upon him. But whether he could have secured bond sooner, or otherwise have minimized his damages was a question of fact for the jury. The burden of proving a lack of due diligence in this respect was upon the defendant. 17 C. J., 1025, 25 C. J. S., Damages, § 144, 15 Am. Jur., § 331, p. 770.

Finally, it is claimed that the verdict of the jury is excessive and unsupported by the evidence. The jury awarded the plaintiff the sum of $3,000.00 actual damages. Various elements of damage were testified to by the plaintiff without objection. But it is suggested that many of these elements are based upon speculation, and are too remote, and are impossible of admeasurement.

In actions sounding in damages merely, where the law furnishes no legal rule for measuring them, the amount to be awarded rests largely in the discretion of the jury controlled by the discretionary power of the Circuit Judge.

Upon motion for a new trial based on this ground the trial Judge refused to disturb the verdict. We would not be justified in setting it aside unless it were clearly so excessive as to indicate that it was the result of passion, caprice, prejudice, or corruption; or unless the jury disregarded the evidence or the rules of law; or unless it can be shown that the trial Judge abused his discretion. Since it is for the jury and not for the Court to fix the amount of the damages, their verdict in an action for unliquidated damages will not be set aside merely because it is large or because the reviewing Court might have awarded less. Full compensation is impossible in the abstract, and different individuals vary in their estimate on the sum which would be a just pecuniary compensation. Hence, all that the Court should do is to see that the jury approximates a sane estimate, and does not exceed a rational appraisal.

The plaintiff testified that the salaries of the employees of his show amounted to $517.00 per week. He was prevented by the levy under the attachment from showing in Chester during one week, and it is reasonably inferable that he had to pay out the above amount. He had a total weekly income from eight concessionaires under contract, of $250.00. This he lost by reason of the fact that they could not ply their trade or business during the week the show was idle. Assuming that several other items were speculative and therefore unnecessary to be discussed, the plaintiff testified that by reason of the attachment his business was injured as a direct and proximate cause of the attachment, in that his show was stigmatized. As a result of it concessionaires left him because they did not wish to be connected with a show which apparently could not pay its bills. And he could no longer demand or obtain from those who remained the price for concessions which he had previously received. Because his show was lying idle and incapable of filling its engagement at Chester, discouraged concessionaires left him to join other shows, and a consid-

erable period of time elapsed before he could fill their places. In addition to this he suffered humiliation. And in our opinion, all of these matters to which we have referred, under the evidence, were proper subjects for consideration by the jury as elements of damage.

While the amount of the verdict might appear to be full, we are not prepared to hold that the award is so excessive as to warrant our interference. For a full discussion of the law with reference to compensatory damages for the infliction of humiliation and wounded feelings, see *Currie v. Davis,* 130 S. C., 408, 126 S. E., 119, in which case a much larger verdict was sustained.

Judgment affirmed.

MR. CHIEF JUSTICE BONHAM and MESSRS. JUSTICES BAKER and FISHBURNE concur.