489 S.E.2d 223

**W.J. GETSINGER, Jr. and Hugh C. Horry, Appellants,**

**v.**

**MIDLANDS ORTHOPAEDIC PROFIT SHARING PLAN, Ercell P. McGowan, Robert D. Peeples, Southern Pine Plantations, Inc., P.L. Tuten, Julia Ann Tuten, Julia Ann Pope, Jasper County, and all other persons unknown or having or claiming any right, title, estate, or interest in or lien upon the real property described in the Complaint herein, being designated collectively as Jane Doe and Richard Roe, including all heirs, distributees, or devisees of any unknown persons in the Armed Forces of the United States of America, any minors, and including persons non compos mentis and all other persons under any disability of any kind or nature who might have claim to or any right, title, estate, or interest in or lien upon the real property described in the Complaint, Respondents.**

No. 2687.

Court of Appeals of South Carolina.

Heard June 4, 1997.

Decided June 16, 1997.

Rehearing Denied Aug. 28, 1997.

R. Thayer Rivers, Jr., Ridgeland, for Appellants.

Darrell Thomas Johnson, Jr., Hardeeville, for Respondents.

ANDERSON, Judge:

W.J. Getsinger, Jr. and Hugh C. Horry (Appellants) appeal the circuit court's order granting a directed verdict in favor of Respondent Midlands Orthopaedic Profit Sharing Plan (Midlands).[1] The judge found as a matter of law that Midlands and its predecessors in title had adversely possessed a parcel of land claimed by Appellants. We reverse and remand for a new trial.

## FACTS/PROCEDURAL BACKGROUND

On June 24, 1993, Appellants filed this action seeking to have a legal determination of the ownership and true boundaries of a parcel of land. Respondent Midlands filed an answer on July 29, 1993, in which it claimed title by adverse possession. At the close of all the evidence, the circuit court judge directed a verdict in favor of Midlands. Appellants filed a Rule 59(e), SCRCP motion for reconsideration, which was denied.

## ISSUE

Did the circuit court err in directing a verdict for Respondent Midlands on its claim of adverse possession?

---

**1.** For simplicity, we shall refer only to Midlands as the respondent in this action. All other respondents were named parties solely because they are, for the most part, adjoining landowners.

## STANDARD OF REVIEW

The determination of title to real estate is legal in nature. *Wigfall v. Fobbs,* 295 S.C. 59, 367 S.E.2d 156 (1988); *Clark v. Hargrave,* 323 S.C. 84, 473 S.E.2d 474 (Ct.App.1996). Likewise, an adverse possession claim is an action at law. *Miller v. Leaird,* 307 S.C. 56, 413 S.E.2d 841 (1992). Ordinarily, the question of adverse possession is one of fact for the jury and only becomes one of law for the court when the evidence is undisputed and susceptible of but one inference. *Mullis v. Winchester,* 237 S.C. 487, 118 S.E.2d 61 (1961); *Lynch v. Lynch,* 236 S.C. 612, 115 S.E.2d 301 (1960).

It is well established that when considering a motion for a directed verdict, the trial court must view the evidence and all reasonable inferences in the light most favorable to the non-moving party. If the evidence as a whole is susceptible of more than one reasonable inference, the case should be submitted to the jury. *Gamble v. International Paper Realty Corp.,* 323 S.C. 367, 474 S.E.2d 438 (1996); *Rice v. Multimedia, Inc.,* 318 S.C. 95, 456 S.E.2d 381 (1995).

In ruling on a directed verdict motion, the trial court is concerned only with the existence or non-existence of evidence, and the court does not have the authority to decide credibility issues or to resolve conflicts in the testimony. *Garrett v. Locke,* 309 S.C. 94, 419 S.E.2d 842 (Ct.App.1992) (judge erred in granting directed verdict where more than one inference arose from the evidence; conflicts in the testimony were for the jury to resolve as the finders of fact).

In reviewing the grant of a directed verdict, the appellate court should not ignore facts unfavorable to the opposing party. Rather, it must determine whether a verdict for the opposing party would be reasonably possible under the facts as liberally construed in his favor. *Bultman v. Barber,* 277 S.C. 5, 281 S.E.2d 791 (1981).

## BURDEN OF PROOF

"The burden of proof of adverse possession is on the one relying thereon." *Weston v. Morgan,* 162 S.C. 177, 192, 160 S.E. 436, 441 (1931). "A [claimant's] title by adverse possession requires proof of actual, open, notorious, hostile,

continuous, and exclusive possession by the claimant, or by one or more persons through whom he claimed, for the [required] period.... [T]he burden of proof [of adverse possession] is upon the party relying thereon." *Miller*, 307 S.C. at 61, 413 S.E.2d at 844. *See also Forshur Timber Co. v. Santee River Cypress Lumber Co.*, 203 S.C. 225, 178 S.E. 329 (1934) (party claiming adverse possession must prove open, notorious, exclusive, hostile, and continuous possession for the required period), *cert. denied*, 295 U.S. 743, 55 S.Ct. 655, 79 L.Ed. 1689 (1935); *Lyles v. Fellers*, 138 S.C. 31, 42, 136 S.E. 13, 17 (1926) ("The burden of proof of adverse possession is on the one relying thereon."); *Butler v. Lindsey*, 293 S.C. 466, 470, 361 S.E.2d 621, 623 (Ct.App.1987) ("The burden of proof of adverse possession is on the one relying thereon.").

■ The party asserting adverse possession must establish the claim by clear and convincing evidence. *Davis v. Monteith*, 289 S.C. 176, 345 S.E.2d 724 (1986); *Thomas v. Dempsey*, 53 S.C. 216, 31 S.E. 231 (1898). *See also Zinnerman v. Williams*, 211 S.C. 382, 386, 45 S.E.2d 597, 599 (1947) ("The *Thomas–Dempsey* case establishes the principle that a party, in order to acquire title to real estate by adverse possession, must show such possession by clear and convincing evidence."); *Lusk v. Callaham*, 287 S.C. 459, 461, 339 S.E.2d 156, 157 (Ct.App.1986) (The party making the claim "ha[s] the burden of proving adverse possession by clear and convincing evidence.").

■ When it is asserted by the defendant, adverse possession is an affirmative defense. *Miller*, 307 S.C. 56, 413 S.E.2d 841; *Weston*, 162 S.C. 177, 160 S.E. 436; *Suber v. Chandler*, 36 S.C. 344, 15 S.E. 426 (1892).

## *LAW/ANALYSIS*

■ In South Carolina, adverse possession may be established under a 10–year statute of limitation. *See* S.C.Code § 15–3–340 (Supp.1996); S.C. Code § 15–67–210 (1976); S.C.Code § 15–67–220 (1976). The person claiming adverse possession under these statutes must have personally held the

property for 10 years, and tacking [2] is allowed only between an ancestor and an heir. *Terwilliger v. White,* 222 S.C. 176, 72 S.E.2d 169 (1952); *Terwilliger v. Marion,* 222 S.C. 185, 72 S.E.2d 165 (1952). *See also* S.C. Juris. *Adverse Possession* § 19(a) (1991) (during the 10–year period, tacking is not allowed between successive occupants).

In addition to the 10–year statute of limitation for adverse possession, South Carolina common law recognizes the 20–year presumption of a grant. *Terwilliger v. Daniels,* 222 S.C. 191, 72 S.E.2d 167 (1952). *See* S.C. Juris. *Adverse Possession* § 4 n. 4 (1991) (there are several methods for acquiring property through the passage of time, and the acquisition of land under the common law period is more accurately labeled the 20–year presumption of a grant). Under the presumption of a grant, the time of possession may be tacked not only by ancestors and heirs, but also between parties in privity in order to establish the 20–year period. *White,* 222 S.C. 176, 72 S.E.2d 169.

To constitute adverse possession, which results in obtaining title to the disputed property, the possession must be continuous, hostile, open, actual, notorious, and exclusive for the requisite period. *Mullis,* 237 S.C. 487, 118 S.E.2d 61. The claimant's possession must be hostile to not only the true owner, but also to the rest of the world so as to indicate his exclusive ownership of the property. *Id.* These elements must also be present in the presumption of a grant. *See* 3 Am.Jur.2d *Adverse Possession* § 5 (1986) (title by adverse possession is often said to rest on the presumption of a lost grant; mere possession does not afford the presumption of a grant—the possession must be actual, open, adverse, exclusive, and uninterrupted, as well as inconsistent with the existence of title in another, and under a claim or right or title).

Occasional and temporary use or occupation does not constitute adverse possession. *Weston,* 162 S.C. 177, 160 S.E. 436. The nature and location of the land, and the appropriate uses for which it is suited should be considered in

---

**2.** "Tacking" is a doctrine that permits an adverse possessor to add his period of possession to that of a prior adverse possessor in order to establish continuous possession for the required period. Black's Law Dictionary 1452 (6th ed.1990).

determining whether adverse possession has been established. *Mullis*, 237 S.C. 487, 118 S.E.2d 61. Acts of ownership with regard to open, wild, unfenced lands not capable of cultivation are only required to be exercised in a way that is consistent with the use to which such lands may be put, even without actual residency or occupancy. *Id.*

This case involves a parcel of land in Jasper County. The pertinent history of the disputed property is as follows. In 1933, Big Salkehatchie Cypress Company paid taxes on 237 acres of land located in Jasper County. In 1934, land owned by Big Salkehatchie was seized by the sheriff for non-payment of taxes and deeded to the Forfeited Land Commission.[3] The Commission sold the property to John Pat Wise and Henry Garbade the same year. Upon the death of Wise and Garbade, the land was held in a trust managed by C & S Bank for the benefit of the families.

Appellant Horry testified he first heard in 1984 that C & S Bank, as trustee for the Wise/Garbade Estate, was going to sell some of the land. Horry discussed the purchase of Estate property with Appellant Getsinger, who is the grandson of decedent John Pat Wise and also Horry's accountant. According to Horry, the tax map at that time showed the Estate was paying taxes on about 208 acres. Horry stated that, when he purchased several parcels in 1985, it was his understanding that he was getting 71.34 acres "plus all right, title[,] and interest to any [lands] of the Big Salkehatchie Cypress Company." Horry maintained he later discovered there were 75 more acres of land that no one else was claiming. Horry acknowledged there has never been a dispute over ownership of the property which is specifically identified in the deed (i.e., the 71.34 acres), and that he has in fact sold timber off of that property. Horry referred to one of the tracts he acquired as the "Bowers tract."

Appellant Getsinger testified that in the mid–1980's he became aware the trust was going to sell 237 acres, of which

---

3. The parties dispute whether the sheriff seized all of Big Salkehatchie's land in Jasper County or only "so much ... as may be necessary to raise the sum of money" due in taxes, as stated in a "sheriff's deed."

the 71.34 acres was readily identifiable. He stated the purchase in 1985 was for the entire 237 acres.[4]

Respondent Midland's traces its title through Isaiah Orr, who purchased a 69–acre tract in 1959 from the heirs of W.F. Simmons. This deed was a quit claim deed rather than a general warranty deed, giving some indicia to the contention that title difficulties may exist. Orr sold the 69–acre tract to Corrin and Det Bowers in 1973. In 1975, a plat was prepared by Roy L. Green which surveyed the Bowers property as 131 acres, rather than 69 acres. However, the plat was not recorded until 1985. In the chain of title of Midlands, Julia Ann Fennell executed a deed to W.A. Simmons,[5] recorded in Deed Book 3 at page 82, which referenced a plat of the property recorded in Plat Book 17, page 276, dated February 1, 1910, prepared by surveyor E.W. Peeples. This plat depicted 244 acres as highland property rather than swampland. Roy L. Green never referenced this plat in his survey.

In 1989, the Bowers brothers conveyed 131 acres to the Culbertson Company. The deed stated this was "the identical property conveyed to Det Bowers and Corrin Bowers, via that certain deed from Isaiah Orr dated May 9, 1973 . . . ." In a deed recorded the same day, Culbertson thereafter conveyed two parcels of land to Respondent Midlands. Parcel two is described as containing 131 acres but shows its derivation as the deed from Isaiah Orr.

Respondent Midlands called several persons to testify as to their use of the property by themselves and prior occupants. Isaiah Orr testified that his deed called for 69 acres, and that he had paid taxes on the property for fourteen years. Orr stated the land he purchased was all swamp, and he believed

---

**4.** Getsinger testified that it was agreed with family members that the property would be sold to him "as an heir of the property." According to the testimony of a title researcher, C & S Bank, as trustee of the estate of Garbade and Wise, conveyed two parcels to Appellant Getsinger in 1985, who thereafter conveyed a one-half interest to Appellant Horry. Two parcels were identified in the deed, one for 71.34 acres, which is not in dispute, and also "any right, title or interest in any other lands . . . which might have been conveyed to [Garbade and Wise] by Sheriff's deed or tax deed of the lands of Big Salkehatchie Cypress Company."

**5.** W.A. Simmons is the brother of W.F. Simmons.

the high water mark of the swamp was the boundary line. Orr said he cut some of the timber on the land, but he was unable to get the best timber because he did not have the right equipment. He testified that he had permission from P.L. Tuten, a neighboring landowner, to use the road on Tuten's property in order to reach the timber on his own tract. Orr stated that he allowed a man named Wilford Smith to hunt on the property. He said the Tuten and Simmons families also hunted on the property, and that they "knew they had permission for anything they wanted to do." Orr sold the land to Det and Corrin Bowers in 1973.

P.L. Tuten testified that he allowed Orr to cross his property with a timber crew to cut some timber down in the swamp. He said he was not sure how much timber Orr ever cut on the property, but that he did not "think too much [came] out of there because it was always so boggy...." Tuten said that when W.F. Simmons, a previous owner, had the property, he hunted on the property along with a few others, usually from three to ten persons. He said they openly used the property for hunting, using dogs and standers. Tuten testified that when Orr bought the property, "We hunted it right on, he didn't say nothing about it." Tuten stated he never specifically asked Orr for permission to hunt on the premises, but that he assumed Orr would have told him if he had any objection.

When Orr sold the property to the Bowers brothers, he said the "[s]ame crew that had been hunting it all the time" continued to hunt on the property, and no one challenged them. He said once the property was sold to Respondent Midlands, they continued to hunt on the property, and the only difference is that they leased it now. Tuten stated he had been hunting on the property since 1945, no one had ever challenged his right to hunt on the property, and he was never charged with trespassing.

Jacob Malphrus testified that he had hunted on the disputed property with P.L. Tuten and another man for about thirty years. He said they usually hunted for deer using dogs and standers. He said when Midlands bought the property, they had to start paying for the right to hunt on the premises. He now signs a lease with Respondent Midlands for each deer hunting season. He acknowledged that until Midlands pur-

chased the property in 1985, he and his hunting friends essentially "came along with" the property.

Corrin Bowers testified that he and his brother, Det Bowers, now deceased, purchased the property from Orr in 1973. He said the property was all swamp. The deed stated the area was 69 acres, more or less. However, Bowers's son-in-law, Roy Green, Jr., who is a surveyor, prepared a plat in 1975 that surveyed the property at 131 acres. The plat was not recorded until 1985. Bowers stated they had the timber cruised twice to see what was there—once before they purchased the property and again after they owned it. He said they owned an adjoining tract on which they cut timber, and that he thought they may have cut some timber on the disputed tract, but he was not sure. On cross-examination Bowers admitted, "I'm not sure that we cut any timber on [the disputed tract], but I think we cut a little bit on an edge. . . ."

Roy Green, Jr. testified that in 1975 he helped survey what was known as the Metts/Orr tract. He admitted that "basically we surveyed out what was not claimed by other people's plats." He acknowledged that the deed to the property called for 69 acres, more or less, but asserted that the survey showed it to be 131 acres. He stated the total was "131 acres unclaimed by the plats adjoining it [the disputed tract]." He maintained it was not unusual for the total acreage to vary from the amount indicated on the deed because acreage was often estimated in the older deeds. Green testified that he hunted on the property with his father-in-law, Corrin Bowers, "on a number of occasions over the years."

There was also testimony presented suggesting that the description of Appellants' property actually matched property described in another deed that was located nine miles upriver.

■ At the close of all the evidence, the circuit court judge granted a directed verdict in favor of Midlands, finding as a matter of law that Midlands had established adverse possession of the disputed property under the 20–year presumption of a grant. In our view, the evidence clearly created a jury question on the issue of adverse possession. *Cf. White*, 222 S.C. 176, 72 S.E.2d 169 (trial court properly refused to direct a verdict where the testimony created a jury question on the issue of adverse possession). The first indication that one of

the parcels of property was 131 acres instead of 69 was from the 1975 plat that was not filed until 1985. We believe the testimony was susceptible of more than one inference. Accordingly, we reverse the circuit court's decision which directed a verdict in favor of Respondents and remand for a new trial.

## CONCLUSION

For the foregoing reasons, the decision of the circuit court is **REVERSED AND REMANDED.**

HOWELL, C.J., and GOOLSBY, J., concur.