594 S.E.2d 499

**The Late Terry HENSON, by Harriet Hunt, his Aunt and Appointed Guardian ad Litem and Personal Representative, Appellant,**

v.

**INTERNATIONAL PAPER COMPANY, Georgetown Steel Corporation, the City of Georgetown and Georgetown County, Defendants, Of whom International Paper Company is, Respondent.**

**No. 3745.**

Court of Appeals of South Carolina.

Heard Dec. 11, 2003.

Decided Feb. 17, 2004.

Rehearing Denied April 22, 2004.

---

8. *See supra* note 5.

134

Gregg E. Meyers, of Charleston and J. David Flowers, of Greenville, for Appellant.

Sean K. Trundy, of Charleston, for Respondent.

GOOLSBY, J.:

This is a wrongful death action brought by Harriet Hunt against the respondent International Paper Company ("IPC") and others.[1] The issues on appeal relate to the verdict, which Hunt challenges as inconsistent, and to the trial judge's failure to instruct the jury regarding the doctrine of attractive nuisance. We affirm.

## FACTS

Hunt commenced this action against IPC for the wrongful death of Terry Henson ("Terry"). Hunt's complaint alleged negligence, attractive nuisance, and unguarded dangerous condition. IPC answered, pleading affirmative defenses of comparative negligence and sole negligence of others.

---

1. The complaint originally included Georgetown Steel Corporation, the City of Georgetown, and Georgetown County as defendants.

IPC owns and operates a canal that runs twenty-seven miles through Georgetown County. The canal eventually terminates in the City of Georgetown. Several pumping stations aid the flow of the water through the canal. When water reaches the Church Street pumping station, it rushes through an underground, forty-two-inch pipe at 19,000 gallons per minute.

Access roads that IPC uses for maintenance run alongside the entire length of the canal. IPC employees travel these roads Monday through Friday, inspecting the canal. With the exception of some small areas near two schools, the canal is not fenced. "NO TRESPASSING" signs, which IPC erected when it constructed the canal, have disappeared. On Saturday, April 25, 1998, there were no signs warning trespassers of the hazard created by the swift, flowing water.

On that day, ten-year-old Terry and his older brother went to the home of Donnie Lippert, a friend. Another friend, Dustin, had been riding his go-cart near the canal and wanted to show the boys something the record describes as "a dirt jumping hill." The boys walked to the canal and entered the canal property, using a dirt path by a fence that protected the Church Street pumping station.

The boys eventually walked over to a pipe that spans the canal. Metal bracing, which serves as support for the pipe, gives it the appearance of a bridge.

The boys used the pipe to cross over to the other side of the canal, where they found a cast net. Terry decided to enter the water, holding on to the cast net while his friends held the other end. After being in the water for a short period, Terry attempted to grab the metal supports to lift himself out of the water. In the process, he slipped and fell back into the water. With his friends unable to hold on to the cast net, the swift current swept Terry away and he drowned.

IPC knew of at least three other people who had drowned in the canal, two of whom were reportedly good swimmers.

The trial judge directed a verdict in favor of IPC as to attractive nuisance and submitted the case to the jury, using a verdict form to which no one objected.

The form consisted of four questions. The first asked whether IPC was negligent and whether its negligence proximately caused Terry's death. The jury answered "yes." The second question asked whether Terry was negligent and whether his negligence proximately caused his death. Again, the jury answered "yes." Question three instructed the jury to allocate the percentage of negligence attributable to each party. The jury attributed 75 per cent to Terry and 25 per cent to IPC. Question four asked for the total amount of damages sustained by the plaintiff. The jury found $400,000. The question, however, instructed the jury not to reduce the amount of damages by the negligence attributed to Terry. It did not do so.

When the jury reached its verdict, the trial judge instructed the clerk to publish the answers to the verdict form. The clerk read the answers to questions one through three. Once the clerk stated the jury had allocated 75 per cent of the negligence to Terry and 25 per cent to IPC, the trial judge instructed the clerk not to read any further; consequently, the clerk did not publish the jury's answer to the fourth question in the jury's presence.

After affirming the verdict, the judge asked the parties if there was anything else they wanted from the jury. Receiving negative responses from both parties, she dismissed the jurors.

Afterward, the judge published the answer to the fourth question. She explained she did not publish the answer earlier because of the percentage of negligence attributed to the child would not have entitled Hunt to a judgment against IPC.

## LAW/ANALYSIS

### I.

Hunt argues the jury's verdict is inconsistent and also contends the trial judge erred by discharging the jury before publishing the jury's answer to the fourth question.

## A.

Hunt maintains the verdict was inconsistent because the jury, which experienced confusion concerning certain issues it was to decide, found Terry 75 per cent at fault, damages notwithstanding.

■ While it is true the record reflects the jury raised several questions with the trial judge during its deliberations and twice returned to the courtroom for further instructions, the trial judge responded to each question without objection from Hunt. In particular, Hunt did not object to the judge's additional instructions on comparative negligence.[2]

Regarding the verdict form, the trial judge explained to the jury how it was to complete it. She told the jury:

Now, if you answered number three [which instructed the jury to apportion fault if it found the negligence of both parties proximately caused Terry's death] and you put a percentage, and this is again for instructions only, if this should happen, you put a percentage of negligence on the part of the deceased, Terry Henson, you do not lower the amount of damages by that percentage. Do not do it. In other words, even if you found negligence on the part [sic] for this question I want to see the total amount of damages. Do you understand what I'm saying? Do not reduce it by any amount of negligence you might apply.

Hunt did not object to these instructions and, as indicated above, did not object to the verdict form.[3]

Hunt, however, cites cases concerning inconsistent verdicts or the failure of a jury to follow instructions.[4] These cases have no application here. In this instance, the jury rendered

---

**2.** *See Creighton v. Coligny Plaza Ltd. P'ship,* 334 S.C. 96, 119, 512 S.E.2d 510, 522 (Ct.App.1998) (stating because *no objection was raised* concerning the trial judge's jury instruction in regard to contributory negligence, the issue was not preserved for appeal).

**3.** *See Johnson v. Hoechst Celanese Corp.,* 317 S.C. 415, 421, 453 S.E.2d 908, 912 (Ct.App.1995) (holding that by failing to object to a verdict form until after a liability verdict had been reached, party failed to preserve any issue relating to the verdict form).

**4.** *See Johnson,* 317 S.C. 415, 453 S.E.2d 908; *Southeastern Mobile Homes, Inc., v. Walicki,* 282 S.C. 298, 317 S.E.2d 773 (Ct.App.1984).

a verdict that was consistent on its face with the structure of the form submitted to it and the jury completed the verdict form in accordance with the trial judge's instructions.

## B.

Hunt also argues the trial judge erred in discharging the jury before publishing the verdict form to counsel in its entirety. We disagree.

The trial judge properly determined the jury returned a defense verdict based on the law of comparative negligence and in accordance with her instructions; thus, there was no need to publish the entire verdict form in the jury's presence.[5]

## II.

## A.

Tragic as this case is, the trial judge committed no error in directing a verdict in favor of IPC on the issue of attractive nuisance. Settled law supports what the trial judge did.[6] When viewed in the light most favorable to Hunt,[7] the evidence shows Terry was not attracted to the premises by reason of the canal. He went there for another purpose entirely, i.e., to see "a dirt jumping hill." The attractive

---

5. *See Nelson v. Concrete Supply Co.*, 303 S.C. 243, 245, 399 S.E.2d 783, 784 (1991) (adopting the doctrine of comparative negligence and holding plaintiff can recover in South Carolina when his or her negligence is not greater than the defendant's negligence).

6. *See Kirven v. Askins*, 253 S.C. 110, 117, 169 S.E.2d 139, 142 (1969) ("It follows that the doctrine is not applicable where the injured child went into the dangerous situation for some other reason. In *Hancock v. Aiken Mills, Inc.*, 180 S.C. 93, 185 S.E. 188 [ (1936) ], we held that unless the child goes on the property by reason of the temptation of the very instrumentality, which is held to be the attractive nuisance, he cannot recover. Here, the appellant was not attracted to the premises of the respondent by reason of the presence thereon of either the pile of dirt or clods of clay.").

7. *See Adams v. Creel*, 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995) (stating that on an appeal from an order granting a directed verdict, the appellate court views the evidence and all reasonable inferences that can be drawn from the evidence in the light most favorable to the party against whom the verdict was directed).

nuisance doctrine "is not applicable where the injured child went to the dangerous situation for some other reason."[8]

## B.

■ Even if the trial judge erred in directing a verdict as to attractive nuisance, the error is harmless. The questions of whether IPC was negligent and whether IPC maintained an "unguarded condition"[9] remained for the jury's consideration.

Regarding the question of "unguarded condition," where, as here, the element of attractiveness is missing and the child does not enjoy the status of an invitee or business visitor, a child who sustains injury by reason of a dangerous condition of the premises may still have a right of recovery for his or her injuries under appropriate circumstances.[10] Our supreme court has recognized that this right runs "[p]arallel with the attractive nuisance doctrine."[11] We therefore fail to see how the trial judge's directing a verdict on the question of attractive nuisance prejudiced Hunt, being that the trial judge did not direct a verdict on the question of unguarded condition.[12] Then too, the negligence cause of action subsumed both unguarded condition and attractive nuisance.[13]

---

8. *Kirven*, 253 S.C. at 117, 169 S.E.2d at 142.

9. On the issue of "unguarded condition," the trial judge stated, "[I]n looking at the evidence in the light most favorable to the non-moving party, it is a jury issue for their determination and I'm speaking clearly [*sic* ] on the unguarded condition issue."

10. *Everett v. White*, 245 S.C. 331, 335, 140 S.E.2d 582, 584 (1965).

11. *Id.* at 335, 140 S.E.2d at 584.

12. *See* 65A C.J.S. *Negligence* § 507, at 240 (2000) ("Also, even though a thing or a condition may be both attractive and dangerous to children, the attractive nuisance doctrine cannot apply to it unless it is maintained or left in an unprotected or unguarded condition.").

13. *See, e.g., Daniels v. Timmons*, 216 S.C. 539, 550–51, 59 S.E.2d 149, 155 (1950) ("All of the so-called attractive nuisance cases spring from negligence of the defendant in regard to his or her own property which is subject to being entered upon by a child who may be attracted onto the premises."); 65A C.J.S. *Negligence* § 494, at 220 (2000) ("The attractive nuisance doctrine is merely a detailed articulation of ordinary negligence, and under that doctrine, a trespassing child is afforded the protection of ordinary negligence doctrine . . . .").

We recognize the verdict form did not ask the jury to determine the unguarded condition claim separately from the negligence claim; however and as noted above, counsel for both parties examined the form after the trial judge submitted it to the jury and neither side voiced any objection to the form.[14]

## C.

We also have serious reservations regarding whether this court can consider the issue regarding attractive nuisance.[15]

Rule 208(b)(1)(B), SCACR requires an appellant's initial brief to contain "[a] statement of each of the issues presented for review." The rule further states that, "[o]rdinarily, no point will be considered which is not set forth in the statement of the issues on appeal." Chief Justice Toal and her co-authors write in their work *Appellate Practice in South Carolina* that "where an issue is not specifically set out in the statement of issues, the appellate court may nevertheless consider the issue if it is reasonably clear from appellant's arguments." [16]

---

**14.** In fact, counsel for Hunt agreed that principles of negligence applied. In discussing IPC's motion for a directed verdict, he agreed it was "for the jury to say under the circumstances was it reasonable what [IPC] did and how they set it up and was the kid himself liable for it."

**15.** *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) ("No point will be considered which is not set forth in the statement of issues on appeal.") (citing Rule 208(b)(1)(B), SCACR); *Barnes v. Cohen Dry Wall, Inc.*, 357 S.C.App. 280, 592 S.E.2d 311 (2003) (declining to address an argument not set forth in the statement of issues on appeal). We are aware of the supreme court's holding in *Hendrix v. Eastern Distribution, Inc.*, 320 S.C. 218, 464 S.E.2d 112 (1995), wherein the supreme court held this court should not have addressed an issue not preserved for review. The difference between *Hendrix* and this case is that here the question of whether the directed verdict issue is procedurally barred from appellate review is not, like the one in *Hendrix*, a settled one. Moreover, in this case, the dissent addresses the merits of the issue of attractive nuisance; therefore, under the circumstances and in the interest of judicial economy, we think we should likewise do so.

**16.** Toal, Vafai, and Muckenfuss, *Appellate Practice In South Carolina* 75 (2d ed.2002).

For the latter proposition, the authors cite *Southern Welding Works, Inc. v. K & S Construction Co.*,[17] a case decided under the prior Rules of the Supreme Court in which Rule 4, Section 6, required an appellant to include exceptions, among other things, in a transcript of record. Each exception had to contain a concise statement of one proposition of law or fact that the appellant asked the supreme court to review.

Judge Bell, writing for the court of appeals in that case, noted the appellant's exceptions violated Rule 4, Section 6, because they failed to contain a complete assignment of error. Nevertheless, the court elected to consider those issues "which [were] reasonably clear from [appellant's] argument and which were ruled on by the trial court."

What we gleaned from Judge Bell's opinion is that the exceptions, questions, and issues presented for appellate review in that case, namely, whether the appellant had been denied its statutory right to four peremptory challenges and whether the trial court properly refused to allow the appellant to recall a witness, were preserved for appellate review notwithstanding the exceptions did not contain a "because" clause. In other words, although the appellant challenged two particular, identifiable rulings made by the trial court, but failed to detail its reasons for each challenge, the failures were not fatal to its appeal because the court could discover the assignments of error directed to each of the two rulings from the arguments set out in the appellant's brief.

That is a far cry from what Hunt did in this case. Here, Hunt set forth in her initial brief the following issue:

> The trial court erred in *failing to charge* attractive nuisance where a ten year old was attracted to the canal in which he drowned but entered the property for a purpose unrelated to water.

(Emphasis added.)

 The reason the trial judge did not *charge* the law regarding attractive nuisance was because that theory of recovery was no longer an issue in the case.[18] The trial judge

---

17. 286 S.C. 158, 332 S.E.2d 102 (Ct.App.1985).

18. A trial court should confine its instructions to the issues made by the pleadings and supported by the evidence. *Tucker v. Reynolds,* 268 S.C. 330, 233 S.E.2d 402 (1977).

had earlier directed a verdict on that issue in IPC's favor pursuant to its motion.

Nowhere in the issues on appeal does Hunt ask this court to review the granting by the trial judge of IPC's motion for a directed verdict. Rather, Hunt, under an issue relating to *jury instructions*, bootstraps an attack on the trial judge's action in *directing a verdict* by arguing the trial judge erred in refusing to charge attractive nuisance as a basis for recovery.

An issue directed at a trial court's denial of a request to charge does not reasonably and fairly embrace a trial court's granting of a directed verdict.[19] If a party wishes to question a trial court's directing of a verdict in an opposing party's favor, the party should appeal that particular ruling. A challenge to a failure to charge is a poor vehicle by which to challenge the grant of a directed verdict motion.[20] Appellate review of the grant of a motion for a directed verdict and of a denial or granting of a request to charge involve different considerations.[21]

**AFFIRMED.**

CURETON, A.J., concurs. ANDERSON, J., concurs in part and dissents in part in a separate opinion.

---

19. *See* 4 C.J.S. *Appeal and Error* § 591, at 592 (1993) ("Assigning error to one ruling or decision raises no question as to the correctness of another, and a party who has assigned one class of errors will not be allowed to argue another; hence, the scope of the question considered will be determined by the scope of the assignment and the theory presented.").

20. *Cf. State v. Lynn,* 277 S.C. 222, 226, 284 S.E.2d 786, 789 (1981) ("Failure to contemporaneously object to [a] question now advanced as prejudicial cannot be later bootstrapped by a motion for a mistrial."); *State v. Moultrie,* 316 S.C. 547, 555–56, 451 S.E.2d 34, 39 (Ct.App.1994) (quoting *State v. Lynn* ).

21. *See Strange v. S.C. Dep't of Highways and Transp.,* 314 S.C. 427, 429–30, 445 S.E.2d 439, 440 (1994) (holding the trial court, when ruling on a motion of directed verdict and JNOV, is "required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions and to deny the motions where either the evidence yields more than one inference or its inference is in doubt."); *Priest v. Scott,* 266 S.C. 321, 324, 223 S.E.2d 36, 38 (1976) (holding an "alleged error in a portion of a charge must be considered in light of the whole charge, and must be prejudi-

ANDERSON, J. (concurring in part and dissenting in part):

I concur in the result reached by the majority in regard to the following issues:

1. Inconsistent Verdict; and

2. Discharge of the Jury Before Publishing the Verdict Form to Counsel in its Entirety.

I disagree with the reasoning and analysis of the majority in regard to the issue of attractive nuisance. The holding of the majority misconstrues and misapplies the law extant in reference to the doctrine of attractive nuisance. **I VOTE to REVERSE and REMAND for trial disposition.**

## FACTS/PROCEDURAL BACKGROUND

Hunt commenced this action against International Paper Company [22] ("IPC") in her capacity as guardian *ad litem* and court-appointed representative for the late Terry Henson ("Terry"). The complaint alleged wrongful death, attractive nuisance, and unguarded dangerous condition. IPC answered, pleading affirmative defenses of comparative negligence and sole negligence of others. The issue of liability was bifurcated from the trial of punitive damages.

IPC owns and operates a canal, which runs twenty-seven miles through Georgetown County, eventually terminating in the city of Georgetown. The depth of the canal ranges from twelve to twenty feet depending on conditions. Because of the water's coloration, one looking into the water would not be able to judge the canal's depth.

Water flows through the canal assisted by a number of pumping stations to what is known as the Church Street pumping station. Located close to Georgetown High and Georgetown Middle Schools, the Church Street pumping station separates the schools from residential and commercial

---

cial to the appellant to warrant a new trial."); *Tucker v. Reynolds*, 268 S.C. 330, 335, 233 S.E.2d 402, 404 (1977) (holding instructions to the jury should be confined to the issues made by the pleadings and supported by the evidence).

**22.** Although the complaint originally included Georgetown Steel Corporation, the City of Georgetown, and Georgetown County as defendants, the case went to trial against IPC alone.

areas. When water reaches the Church Street pumping station, large electric pumps push the water through an underground pipe forty-two inches in diameter. The pipe runs from the pumping station to a paper mill. The pumps typically push 19,000 gallons of water per minute through the pipe, and this is the flow rate at which the pumps were operating on the day in question.

Access roads used for maintenance are located along the entire length of the canal. Employees of IPC traverse these roads inspecting the canal Monday through Friday. With the exception of some small areas near the schools, the canal is not fenced. Although an employee testified IPC put up no trespassing signs when the canal was first constructed, the signs "didn't stay." IPC does not dispute there were no warning signs in place at the time of the events in question.

On April 25, 1998, ten-year-old Terry and his older brother went to the home of Terry's friend, Donnie Lippert. Another friend, Dustin, had been riding his go-cart near the canal and wanted to show the boys a "dirt jumping hill." With this in mind, the boys walked to the canal. Upon arriving, they entered the canal property via a dirt path located along a fence protecting the Church Street pumping station.

The boys eventually walked towards a pipe that crosses the canal. The pipe extends from the bank on one side of the canal, runs across the water, and into the bank on the other side of the canal. Metal bracing, which serves as support for the pipe, gives it a bridge-type look. Due to the construction, the pipe is known as the "pipe bridge."

Donnie testified that Terry saw the pipe and wanted to walk across it to the other side of the canal. Arriving on the other side, the boys found a cast net and Terry decided he could use the rope from the cast net to "hold on while he got into the water." After being in the water for a short period of time, Terry attempted to climb out using the metal support structure. Although his friends were grasping the rope and he was clenching onto the metal supports, Terry slipped and his friends were unable to hold on to the rope.

Donnie averred that even though the water looked calm, after the boys lost their grip on the rope, Terry was swept down the canal very quickly. Terry's brother declared that

Terry traveled so fast down the canal towards the Church Street pumping station they were unable to reach him in time to help. It is undisputed Terry drowned.

IPC stipulated (1) it knew of at least three other drownings that have taken place in the canal; and (2) two of victims were good swimmers.

At trial, IPC moved for, and was granted, a directed verdict on the applicability of the attractive nuisance doctrine to the facts of the case. The trial court ruled, "The case law indicates that the reason they needed to have gone [to the canal] was that they were attracted by this nuisance, it was attractive nuisance and the evidence in this case is clear they went [to the canal] for another purpose and then went to this, this site." Hunt argues the ruling was error.

## ISSUE

Did the trial court err in granting a directed verdict and failing to charge attractive nuisance where the decedent was attracted to the water in which he drowned, but entered the property for another reason?

## STANDARD OF REVIEW

"The grant or denial of new trial motions rests within the discretion of the trial judge and his decision will not be disturbed on appeal unless his findings are wholly unsupported by the evidence or the conclusions reached are controlled by error of law." *Stevens v. Allen,* 336 S.C. 439, 446, 520 S.E.2d 625, 628–629 (Ct.App.1999) (citing *Vinson v. Hartley,* 324 S.C. 389, 477 S.E.2d 715 (Ct.App.1996)); *accord Norton v. Norfolk S. Ry. Co.,* 350 S.C. 473, 478, 567 S.E.2d 851, 854 (2002); *South Carolina State Highway Dep't v. Clarkson,* 267 S.C. 121, 126–27, 226 S.E.2d 696, 697–98 (1976).

A motion for directed verdict goes to the entire case and may be granted only when the evidence raises no issue for the jury as to the defendants liability. *Carolina Home Builders, Inc. v. Armstrong Furnace Co.,* 259 S.C. 346, 358, 191 S.E.2d 774, 779 (1972).[T]he court may direct a verdict in favor of the defendant when the testimony affords no basis for a recovery in favor of the plaintiff. *Hillhouse v. Jennings,* 60 S.C. 392, 401, 38 S.E. 596, 599 (1901). When the evidence yields only

one inference, a directed verdict in favor of the moving party is proper. *Swinton Creek Nursery v. Edisto Farm Credit, ACA,* 334 S.C. 469, 476–77, 514 S.E.2d 126, 130 (1999); *Sims v. Giles,* 343 S.C. 708, 714, 541 S.E.2d 857, 860 (Ct.App.2001). However, if the evidence as a whole is susceptible of more than one reasonable inference, the case must be submitted to the jury. *Quesinberry v. Rouppasong,* 331 S.C. 589, 594, 503 S.E.2d 717, 720 (1998); *Getsinger v. Midlands Orthopaedic Profit Sharing Plan,* 327 S.C. 424, 426, 489 S.E.2d 223, 223 (Ct.App.1997); *see also Heyward v. Christmas,* 352 S.C. 298, 305, 573 S.E.2d 845, 848 (Ct.App.2002) (finding if the evidence is susceptible of more than one reasonable inference, a jury issue is created and the court may not grant a directed verdict).

On appeal from an order granting a directed verdict, the appellate court views the evidence and all reasonable inferences from the evidence in a light most favorable to the party against whom the directed verdict was granted. *Hinkle v. Nat'l Cas. Ins. Co.,* 354 S.C. 92, 96, 579 S.E.2d 616, 618 (2003) ("When considering a directed verdict . . . motion, the trial court is required to view the evidence and the inferences that can be drawn from that evidence in the light most favorable to the nonmoving party."); *Sabb v. South Carolina State Univ.,* 350 S.C. 416, 427, 567 S.E.2d 231, 236 (2002) (In ruling on directed verdict . . . motions, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions.); *Thomasko v. Poole,* 349 S.C. 7, 11, 561 S.E.2d 597, 599 (2002) (A trial judge, when ruling on a motion for directed verdict, must view the evidence in the light most favorable to the non-moving party.); *Sims v. Giles,* 343 S.C. 708, 714, 541 S.E.2d 857, 860 (Ct.App.2001) (In ruling on a motion for directed verdict, the court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.). If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and the motion should have been denied. *Adams v. G.J. Creel & Sons, Inc.,* 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995); *see Jinks v. Richland County,* 355 S.C. 341, 345, 585 S.E.2d 281, 283 (2003) (In ruling on motions for directed verdict . . ., the trial court is required to view the evidence and the inferences

that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions and to deny the motions where either the evidence yields more than one inference or its inference is in doubt.).

When considering directed verdict motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence. *Harvey v. Strickland,* 350 S.C. 303, 308, 566 S.E.2d 529, 532 (2002); *Pond Place Partners v. Poole,* 351 S.C. 1, 15, 567 S.E.2d 881, 888 (Ct.App.2002); *Boddie–Noell Props., Inc. v. 42 Magnolia P'ship,* 344 S.C. 474, 482, 544 S.E.2d 279, 283 (Ct.App.2000). The issue must be submitted to the jury whenever there is material evidence tending to establish the issue in the mind of a reasonable juror. *Hanahan v. Simpson,* 326 S.C. 140, 149, 485 S.E.2d 903, 908 (1997); *Hurd v. Williamsburg County,* 353 S.C. 596, 609, 579 S.E.2d 136, 143 (Ct.App.2003). Yet, this rule does not authorize submission of speculative, theoretical, and hypothetical views to the jury. *Small v. Pioneer Mach., Inc.,* 329 S.C. 448, 461, 494 S.E.2d 835, 848 (Ct.App.1997). Our courts have recognized that when only one reasonable inference can be deduced from the evidence, the question becomes one of law for the court. *Bell v. Bank of Abbeville,* 211 S.C. 167, 173, 44 S.E.2d 328, 330 (1947); *Small,* 329 S.C. at 461, 494 S.E.2d at 848. A corollary of this rule is that verdicts may not be permitted to rest upon surmise, conjecture, or speculation. *Hanahan,* 326 S.C. at 149, 485 S.E.2d at 908; *Small,* 329 S.C. at 461, 494 S.E.2d at 848.

This does not mean the court should ignore facts unfavorable to the opposing party. *Long v. Norris & Assocs., Ltd.,* 342 S.C. 561, 568, 538 S.E.2d 5, 9 (Ct.App.2000); *Love v. Gamble,* 316 S.C. 203, 208, 448 S.E.2d 876, 879 (Ct.App.1994). In deciding whether to grant or deny a directed verdict motion, the trial court is concerned only with the existence or nonexistence of evidence. *Hurd,* 353 S.C. at 609, 579 S.E.2d at 143; *Pond Place Partners, Inc.,* 351 S.C. at 15, 567 S.E.2d at 888. This court can only reverse the trial court when there is no evidence to support the ruling below. *Steinke v. South Carolina Dep't of Labor, Licensing & Regulation,* 336 S.C. 373, 386, 520 S.E.2d 142, 148 (1999); *Welch v. Epstein,* 342 S.C. 279, 300, 536 S.E.2d 408, 418 (Ct.App.2000). Essentially, our

court must resolve whether it would be reasonably conceivable to have a verdict for a party opposing the motion under the facts as liberally construed in the opposing partys favor. *Harvey,* 350 S.C. at 309, 566 S.E.2d at 532; *Hanahan,* 326 S.C. at 149, 485 S.E.2d at 908; *Hurd,* 353 S.C. at 608, 579 S.E.2d at 142.

## *LAW/ANALYSIS*
### ATTRACTIVE NUISANCE

Appellant professes the trial court erred by granting IPC's directed verdict motion as to the cause of action for attractive nuisance. Specifically, Appellant argues the trial court erroneously concluded South Carolina case law requires a plaintiff alleging attractive nuisance to be attracted to the property by the instrumentality which causes injury or death. Appellant contends this conclusion reads the attractive nuisance case law too narrowly. Appellant's position is that, although the boys were attracted to the canal property for a reason unrelated to the canal itself, once on the property, they were attracted to the water in which Terry drowned and this is sufficient to support the cause of action. I agree.

The origins of the attractive nuisance doctrine in South Carolina can be traced to the 1885 decision in *Bridger v. Asheville & Spartanburg R.R. Co.* 25 S.C. 24 (1886). In *Bridger,* a case concerning injuries to a minor, our Supreme Court adopted the position championed in what has come to be known as the "turntable cases." *Id.; see, e.g., R.R. Co. v. Stout,* 17 Wall. 657, 84 U.S. 657, 21 L.Ed. 745 (1873) (holding that a child could recover for injuries caused as a result of the failure of the railroad company to keep its turntable locked or guarded). In ruling that the question of liability was for the jury, the *Bridger* Court placed emphasis on the fact that "there was testimony that the turntable was a dangerous machine; that it was left and located in an exposed place, easily accessible, unguarded, unfenced and unlocked and that the plaintiff was of that age when he was incapable of . . . appreciating [its] danger." 25 S.C. at 29.

Following *Bridger,* South Carolina courts have had many opportunities to develop the doctrine of attractive nuisance. *See Franks v. S. Cotton Oil Co.,* 78 S.C. 10, 58 S.E. 960 (1907);

*McLendon v. Hampton Cotton Mills Co.,* 109 S.C. 238, 95 S.E. 781 (1917); *Sexton v. Noll Constr. Co.,* 108 S.C. 516, 95 S.E. 129 (1918); *Renno v. Seaboard Air Line Ry.,* 120 S.C. 7, 112 S.E. 439 (1922); *Hart v. Union Mfg. & Power Co.,* 157 S.C. 174, 154 S.E. 118 (1930); *Bannister v. F.W. Poe Mfg. Co.,* 162 S.C. 1, 160 S.E. 138 (1931); *Hancock v. Aiken Mills, Inc.,* 180 S.C. 93, 185 S.E. 188 (1936); *Perrin v. Rainwater,* 186 S.C. 181, 195 S.E. 283 (1938); *Daniels v. Timmons,* 216 S.C. 539, 59 S.E.2d 149 (1950); *Bush v. Aiken Elec. Co-op., Inc.,* 226 S.C. 442, 85 S.E.2d 716 (1955).

Expanding on the ideals expressed in *Bridger, Franks v. Southern Cotton Oil Co.,* 78 S.C. 10, 58 S.E. 960 (1907), articulated what would become the foundation of our current law on the doctrine. In *Franks,* the Court sustained a denial of defendant's demurrer with regard to a complaint alleging attractive nuisance, when a child under ten years old drowned in a reservoir located on defendant's property, where young children were known to play. *Id.* at 12, 58 S.E. at 963. In reaching its decision, the Court adopted the following excerpt from *Thompson on Negligence* § 1030:

We now come to a class of decisions which hold the landowner liable in damages in the case of children injured by dangerous things suffered to exist unguarded on his premises, where they are accustomed to some [sic] with or without license. These decisions proceed on one or the other of two grounds: (1) That where the owner or occupier of grounds brings or artificially creates something thereon which from its nature is especially attractive to children, and which at the same time is dangerous to them, he is bound, in the exercise of social duty and the ordinary offices of humanity, to take reasonable pains to see that such dangerous things are so guarded that children will not be injured by coming in contact with them. (2) That although the dangerous thing may not be what is termed an 'attractive nuisance'—that is to say, may not have especial attraction for children by reason of their childish instincts—yet where it is so left exposed that they are likely to come in contact with it, and where their coming in contact with it is obviously dangerous to them, the person so exposing the dangerous thing should reasonably anticipate the injury that is likely to happen to them from its being so exposed, and is bound to take

reasonable pains to guard it, so as to prevent injury to them.

*Id.* at 15, 58 S.E. at 963 (emphasis added).

The attractive nuisance aspect of the Franks decision did not depend on whether the child was actually attracted to the property on which he was injured, rather the question was whether the landowner maintained a dangerous condition on his property that appealed to "childish instincts and impulses." Id. at 13, 58 S.E. at 962 (citation omitted). Although collateral to the issue currently being addressed, in the years following the decision, several courts recognized the alternate ground for recovery based not on the attractiveness of instrumentality, but its dangerousness. *See, e.g., Everett v. White,* 245 S.C. 331, 140 S.E.2d 582 (1965) (reaffirming adoption of the doctrine).

A review of cases applying the attractive nuisance doctrine articulated in *Franks* proves instructive. In *Hayes v. Southern Power Co.,* 95 S.C. 230, 78 S.E. 956 (1913), the Court upheld a jury verdict based upon attractive nuisance where defendant maintained live electrical wires just inside a window of a building, near which children were known to play. *Id.* at 233, 78 S.E. at 958. The Court based its decision primarily on the principles articulated in *Franks. Id.* at 239, 78 S.E. at 960. The decision does not question why the injured child was on the property of the defendant.

In *Hart v. Union Manufacturing & Power Co.,* 157 S.C. 174, 154 S.E. 118 (1930), a young child was electrocuted after climbing a metal electrical tower. *Id.* at 181–82, 154 S.E. at 121. There was no evidence the child was attracted to the defendant's property because of the existence of the dangerous tower itself. Instead, testimony showed it was common knowledge that the area in which the tower was located was "peculiarly attractive to children." *Id.* at 183, 154 S.E. at 121. Although there was no direct evidence proving the defendant knew children played around the tower, the Court held the jury could infer knowledge from the fact that "[a]ll about the tower were indications that the grounds were used constantly by children at play." *Id.* at 185, 154 S.E. at 122.

The court's ruling in the instant case and IPC's position on appeal—that the child must be attracted to the property by

the device that causes injury—appear to be based primarily on the Supreme Court's decision in *Hancock v. Aiken Mills, Inc.*, 180 S.C. 93, 185 S.E. 188 (1936). In *Hancock*, a thirteen-year-old boy was seriously burned after standing near a fire built in the yard of his home by the defendants. *Id.* at 95, 185 S.E. at 189. The child testified he went near the fire to report on a personal errand to one of the defendants, not because he was attracted to it. *Id.* at 100, 185 S.E. at 191.

The *Hancock* Court relied primarily on the decision in *Sexton v. Noll Construction Co.*, 108 S.C. 516, 95 S.E. 129 (1918), to find these facts did not support a cause of action for attractive nuisance. In *Sexton*, children were attracted to a mound of sand situated on a vacant lot. *Id.* at 520, 95 S.E. at 130. The attraction consisted of "rolling down" the hill, an activity which, taken alone, involves little danger. *Id.* However, a "pot" of boiling asphalt was located nearby. *Id.* As the plaintiff was leaving the sand mound, he walked by the pot and was injured when some of the asphalt sprayed onto him. *Id.* at 521, 95 S.E. at 130. The Court reversed a verdict for the plaintiff based on the absence of proximate cause. *Id.* at 522–523, 95 S.E. at 131. The Court explained that "the plaintiff . . . was not playing with the pot at the time of injury; nor was his conduct influenced in any respect by reason of the fact that the pot was obviously dangerous on account of its exposed condition." *Id.* (citation omitted). The Court based its decision on the lack of attraction to the instrumentality causing injury, not that the child was on the property for another reason.

After determining the reasoning of *Sexton* disposed of the attractive nuisance issue, the *Hancock* Court cited authorities from other jurisdictions in support of its conclusion. 180 S.C. at 103–104, 185 S.E. at 193. While this authority stands for the proposition championed by IPC and the trial court—i.e., that a plaintiff cannot recover unless he or she goes onto the property by reason of the attraction to the device which is found to be the attractive nuisance—, such authority was not necessary to the decision in the case. *Id.*

Although in the past this position was accepted by a number of jurisdictions, *see United Zinc & Chemical Co. v. Britt*, 258 U.S. 268, 42 S.Ct. 299, 66 L.Ed. 615 (1922) (holding same), the

principle is now generally rejected. *See* Restatement (Second) of Torts § 339 cmt. b (1965). Section 339 of the Restatement provides:

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

As the drafters of the Restatement explain, "[i]t is now recognized by most of the courts that the basis of the rule is merely the ordinary negligence basis of a duty of reasonable care not to inflict foreseeable harm on another, and that the fact that the child is a trespasser is merely one of the facts to be taken into consideration." Restatement (Second) of Torts § 339 cmt. b; *see also* 62 Am.Jur.2d *Premises* §§ 313, 316 (1990) (noting attractiveness requirement has been relegated to little importance, or more commonly, disposed of altogether).

Pre-*Hancock* cases demonstrate and post-*Hancock* cases confirm South Carolina has never been one of the few jurisdictions which adhere to this rule. In *Perrin v. Rainwater,* 186 S.C. 181, 195 S.E. 283 (1938), a cause of action under attractive nuisance was stated when a seven-year-old girl, while on appellant's property for dance class, was attracted to a fire escape and fell to her death. *Id.* at 185–186, 195 S.E. at 284.

Similarly, in *Daniels v. Timmons,* 216 S.C. 539, 59 S.E.2d 149 (1950), tenants in an apartment complex stated a cause of

action for attractive nuisance, when their fifteen-month-old son was attracted to and injured by a defective stairway located on the rented property. *Id.; see also Lynch v. Motel Enters., Inc.*, 248 S.C. 490, 151 S.E.2d 435 (1966) (finding it a jury question whether or not child was attracted to the pool in which he drowned).

In *Kirven v. Askins*, 253 S.C. 110, 169 S.E.2d 139 (1969), a child was injured by being struck with a clod of dirt or clay while on the property of the defendant. *Id.* at 112, 169 S.E.2d at 139. Although it was known to all parties that children frequented the premises, there was no evidence to suggest the children were attracted to the premises by the desire to throw dirt clods. *Id.* at 113–114, 169 S.E.2d at 140. The main issue in *Kirven* concerned whether the clods of dirt could be considered "unreasonably dangerous to children." *Id.* at 115, 169 S.E.2d at 141. Based on the facts of the case, the Court found that a clod of dirt "was not a dangerous thing or instrumentality as is required to establish liability under either the attractive nuisance doctrine or the alternate ground of recovery stated in *Everett v. White.*" *Id.* at 117, 169 S.E.2d at 141.

Concerning the prerequisites for sustaining a cause of action based on attractive nuisance, the *Kirven* Court explicated: "[I]t is necessary that the condition or instrumentality which caused the injury, should have actually attracted the child into danger. It follows that the doctrine is not applicable where the injured child went into the dangerous situation for some other reason." *Id.* at 117, 169 S.E.2d at 142. Had the Court stopped its commentary here, I would be in total agreement, as this is a correct interpretation of the law of attractive nuisance as it has developed in South Carolina. However, the Court went on to quote the language from *Hancock* requiring the child to be on the property because of the attractiveness of the instrumentality causing injury. *Id.*

A review of the facts in the current case elucidates the contrariety of the two statements. It is undisputed the children went to the canal property for a reason unrelated to the canal itself and there were no signs warning of the dangers posed by the water or effective fencing to prevent unsuspecting children from coming into contact with it. One of the boys testified that once on the property, Terry saw the pipe bridge

and wanted to walk across it. He further maintained that upon finding a cast net on the other side of the pipe bridge, Terry got the idea to tie the rope from the net around his waist so he could enter the water of the canal.

Under the first explanation in *Kirven*, Terry would clearly meet the prerequisites for maintaining an attractive nuisance action. Explicably, the "instrumentality which caused the injury ... actually attracted the child into danger." *Kirven*, 253 S.C. at 117, 169 S.E.2d at 142. Terry was attracted to the pipe bridge, and it was the accessibility of this pipe bridge, coupled with the latent dangerousness of the water in the canal, that created the danger. Furthermore, there is no evidence that Terry went into the dangerous situation, i.e., onto the pipe bridge and into the water, "for any other reason" than his attraction to the water.

Alternatively, if the second proposition is followed, the fact that Terry was attracted to the dangerous condition has no consequence whatsoever even if IPC knew children often frequented the property. Once it is determined Terry and his friends entered the property without the canal in mind, the analysis ends. To follow this position would undermine nearly every case decided to date in South Carolina. It would emasculate the idea that the doctrine of attractive nuisance is one "based upon humanity and the wholesome maxim, '*Sic utere tuo ut alienum non laedas*' [ (So use your own as to not injure another's property) ]." *Franks v. S. Cotton Oil Co.*, 78 S.C. 10, 19, 58 S.E. 960, 963 (1907).

Therefore, I find that the trial court erred in granting a directed verdict as to Terry's cause of action for attractive nuisance. The issue should have been submitted to the jury.

Finally, IPC asserts as an additional sustaining ground that, even if the trial court erred in not sending the attractive nuisance cause of action to the jury, this error is harmless. Specifically, IPC argues, "[W]hile the Plaintiff may have lost the attractive nuisance doctrine, she retained the similar unguarded condition cause of action."

Juxtaposition of the theories of "attractive nuisance" and "unguarded condition" demonstrates with clarity the dissimilarities of elements in each theory. In contrariety to the argument of IPC, there is no amalgamation of these theories

in this case. An academic review of the law of attractive nuisance reveals a separate and distinct cognizable theory of the common law with venerable origins.

Because it is axiomatic that a party may bring as many causes of action as he or she may have, I find this argument to be without merit. *See* Rule 8, SCRCP (noting a party may state as many separate causes of action as he has regardless of their consistency).

## CONCLUSION

Based on an illogical and strait-jacket analysis, the majority engrafts on the doctrine of attractive nuisance an exception: the child was *not* attracted to the venue by the dangerous condition. This ill-conceived notion and idea ignores the reality of the case *sub judice*. Incipiently, the child visited the venue for "hill jumping purposes" but was attracted to the dangerous condition existing at the venue: "the canal."

The factual duality of this case, i.e., the initial non-attraction and the actual attraction to the dangerous condition proves the necessity to recognize the position articulated by § 339 of the Restatement (Second) of Torts (1965).

Relying upon *Hancock v. Aiken Mills, Inc.*, 180 S.C. 93, 185 S.E. 188 (1936), the majority eviscerates the basic doctrine of attractive nuisance. The factual dissimilarities of *Hancock* and the present case dissuade the Court from any precedential impact of *Hancock*. Additionally, the actual holding in *Hancock* does *not* give credence to the conclusion that the doctrine of attractive nuisance has no efficacy if there is no initial attraction of the child to the dangerous condition.

An academic review of *Hancock* leads to the ineluctable conclusion that a venue may be bifurcated in the originality of the attraction and the attraction of an actual dangerous condition at the same site.

The holding of the majority renders the attractive nuisance doctrine impotent and non-utilitarian. This result is neither warranted nor desirable in South Carolina jurisprudence.

The most troubling and vexatious aspect of the ruling of the majority is the failure to recognize the attraction of the child to this dangerous condition existing on the property. Several

children have already drowned in this canal; yet, the majority creates a legalistic and protective barrier against the application of the doctrine of attractive nuisance.

Accordingly, based on the foregoing, I **VOTE** to **AFFIRM IN PART, REVERSE IN PART, and REMAND** for trial disposition.